**Rahn J. FARRIS, Plaintiff,**

v.

**COUNTY OF CAMDEN, Camden County Democratic Committee, George E. Norcross, III, Louis Bezich, Joseph Benton, Thomas Mitchell, John Adler, Jack Gallagher, Gallagher Associates, Inc., Judy Palombi and Phyllis Pearl, Defendants.**

**No. CIV. A. 97–5069.**

United States District Court, D. New Jersey.

Aug. 20, 1999.

Jerald R. Cureton, Darryl S. Caplan, Anthony Valenti, Cureton, Caplan & Clark, Mt. Laurel, NJ, for Plaintiff, Rahn J. Farris.

Walter F. Timpone, John T. Coyne, McElroy, Deutsch & Mulvaney, Morristown, NJ, for Defendant, County of Camden.

William M. Tambussi, Brown & Connery, Westmont, NJ, for Defendants, the Camden County Democratic Committee and George E. Norcross, III.

Anthony J. Zarrillo, Jr., Zarrillo & Zappacosta, Cherry Hill, NJ, for Defendant Louis Bezich.

William A. Garrigle, Garrigle, Palm & Thomasson, Cherry Hill, NJ, for Defendant, Thomas A. Mitchell.

Scott A. Krasny, John Stuart Furlong, Furlong & Krasny, West Trenton, NJ, for Defendant, Judy Palombi.

John B. Kearney, Kearney, Castillo & Blake, P.C., Haddon Heights, NJ, for Defendant, Phyllis Pearl.

OPINION

ORLOFSKY, District Judge.

## TABLE OF CONTENTS

I.   INTRODUCTION............................................... 311
II.  BACKGROUND ............................................... 313
III. LEGAL STANDARD GOVERNING MOTIONS FOR SUMMARY JUDG-
     MENT...................................................... 320
IV.  DISCUSSION ............................................... 321
     A.  Defendants' Motions for Summary Judgment ............. 321
         1.  Norcross's and the CCDC's Motion for Summary Judgment and Appli-
             cation of the Coconspirator Exception to the Hearsay Rule set forth in
             Rule 801(d)(2)(E) of the Federal Rules of Evidence ................ 321
             a.  Counts IX and X, Tortious Interference......................... 321
             b.  Counts XII and XIV, Conspiracy to Tortiously Interfere ......... 328
             c.  Count XIII, Conspiracy to Defraud............................. 330
             d.  Counts XV, XVI, XVII, XVIII, and XIX Conspiracy to Extort,
                 Blackmail and Deprive Farris of his Real Property ............. 331
             e.  The Motion for Sanctions Pursuant to 28 U.S.C. § 1927 and the
                 Court's Inherent Power....................................... 331
         2.  Camden County's Motion for Summary Judgment.................... 335
             a.  Count I, Rescission or Reformation on the basis of Economic
                 Duress ...................................................... 335
             b.  Count II, Rescission or Reformation on the Basis of Fraud and
                 Misrepresentation............................................ 339
             c.  Count III, Rescission or Reformation on the Basis of Unconsciona-
                 bility ....................................................... 341
             d.  Count IV, Breach of the Original 1300 Building lease ............. 343
             e.  Count V, Breach of the Original 1350 Building Lease ............. 344
             f.  Count VI, Common Law Fraud ................................. 345
             g.  Count VII, Breach of Contract/Conversion ..................... 346
             h.  Count XI, Breach of Duty of Good Faith and Fair Dealing ........ 347
             i.  Count XIII, Conspiracy to Defraud............................. 349
             j.  Counts XVII and XIX, Conspiracy to Extort, Blackmail and De-
                 prive Farris of his Real Property ............................. 349
         3.  Mitchell's Motion for Summary Judgment.......................... 350
             a.  Count VI, Common Law Fraud ................................. 350
             b.  Count VIII, Tortious Interference with Contract and Prospective
                 Economic Advantage ......................................... 351
             c.  Count XII, Conspiracy to Tortiously Interfere and Defraud ....... 354
             d.  Counts XV and XVIII, Conspiracy to Extort, Blackmail and De-
                 prive Farris of his Real Property ............................. 354

V.   CONCLUSION ............................................... 355

## I. INTRODUCTION

This diversity case presents novel issues of law arising out of the application of the Federal Rules of Evidence to state law causes of action at the summary judgment stage of the litigation. Specifically, in determining whether Plaintiff, Rahn J. Farris, has produced enough evidence to avoid the entry of summary judgment for Defendants, George E. Norcross, III, and the Camden County Democratic Committee, I must rule on the admissibility of hearsay statements under the coconspirator exception to the hearsay rule set forth in Rule 801(d)(2)(E) of the Federal Rules of Evidence. The application of the coconspirator exception in this case is further complicated by the denial by the alleged declarants, Defendants, Thomas A. Mitchell, Judith Palombi, and Phyllis Pearl, that they made the statements Plaintiff seeks to introduce against Norcross and the Camden County Democratic

Committee. Because this Court's determination of the admissibility of these alleged coconspirators' statements turns on the credibility of the declarants and the witnesses offering their alleged statements, I hold that, prior to resolving the motion for summary judgment, I must conduct a hearing pursuant to Rule 104(a) of the Federal Rules of Evidence,[1] to take testimony and to assess the credibility of the witnesses.

This case also presents a novel issue of New Jersey state law involving whether a chairman of a county political committee can, as a matter of law, conspire with the county political committee, a legal entity which is a creature of New Jersey statute. For the reasons that follow, I hold that just as an authorized agent of a private corporation cannot conspire with the corporation that employs him, so too, a chairman of a county political committee cannot conspire with the county political committee itself.

On October 6, 1997, Plaintiff, Rahn J. Farris, filed a thirty-five count civil complaint in this Court alleging federal and pendent state law claims against Defendants, County of Camden, Camden County Democratic Committee, George E. Norcross, III, Louis Bezich, Joseph Benton, Thomas Mitchell, John Adler, Jack Gallagher, Gallagher Associates, Inc., Judy Palombi and Phyllis Pearl. On December 8, 1998, Defendants, Norcross and the Camden County Democratic Committee, moved for the imposition of sanctions and attorneys' fees against counsel for Plaintiff,

pursuant to 28 U.S.C. § 1927 and the Court's inherent powers. Curiously, no such relief was sought pursuant to Rule 11 of the Federal Rules of Civil Procedure. Shortly thereafter, on February 5, 1999, Norcross and the Camden County Democratic Committee moved for summary judgment on all claims. Similarly on April 30, 1999, and May 10, 1999, respectively, Defendants, the County of Camden and Thomas A. Mitchell, moved for summary judgment on all claims asserted against them. Because Plaintiff voluntarily dismissed his federal causes of action on December 14, 1998, this Court's jurisdiction is based upon 28 U.S.C. §§ 1332 and 1367.[2]

For the reasons set forth below, I shall deny the motion of Defendants, Norcross and the Camden County Democratic Committee, for sanctions and attorneys' fees because they have failed to make the requisite showing that counsel for Plaintiff acted in bad faith in filing the Complaint and in conducting discovery. I shall, however, grant the motion of Norcross and the Camden County Democratic Committee for summary judgment on Plaintiff's claims for civil conspiracy to defraud, extort political contributions, blackmail, and to tortiously interfere with Plaintiff's real property. Insofar as Norcross and the Democratic Committee seek summary judgment on Plaintiff's claims for tortious interference with Plaintiff's contract and prospective economic advantage, and for civil conspiracy to so tortiously interfere and to defraud, I shall deny the motion for summary judgment without prejudice to

---

1. Rule 104(a) provides:
   Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court … In making its determination it is not bound by the rules of evidence except those with respect to privileges.
   See Fed. R. Ev. 104(a).

2. Section 1332 provides, in relevant part:
   The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and

is between—(1) citizens of different States …

See 28 U.S.C. § 1332(a). Section 1367 provides, in relevant part:
   [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.
See 28 U.S.C. § 1367.

the right of Norcross and the Committee to renew this motion at the conclusion of a pre-trial hearing conducted pursuant to Rule 104(a) to determine the admissibility of the alleged coconspirator statements under Rule 801(d)(2)(E) of the Federal Rules of Evidence.

In addition, I shall deny the motion for summary judgment of the County of Camden on Plaintiff's claims for: (1) rescission or reformation of the renegotiated leases between Plaintiff and the County of Camden on the basis of economic duress, equitable fraud, and unconscionability; (2) breach of the original lease covering Plaintiff's building located at 1300 Admiral Wilson Boulevard; and (3) breach of the covenant of good faith and fair dealing. I shall grant the County of Camden's motion for summary judgment on Plaintiff's claims for breach of the original lease covering Plaintiff's property located at 1350 Admiral Wilson Boulevard, common law fraud, and civil conspiracy.

Finally, I shall deny the motion for summary judgment of Defendant, Thomas A. Mitchell, on Plaintiff's claims for common law fraud and civil conspiracy to defraud. I shall, however, grant Mitchell's motion for summary judgment on Plaintiff's claims for tortious interference with Plaintiff's contract and prospective economic advantage, and civil conspiracy.

## II. BACKGROUND

Plaintiff, Rahn J. Farris ("Farris"), a citizen of the Commonwealth of Pennsylvania, was the owner of two commercial buildings located at 1300 and 1350 Admiral Wilson Boulevard, Camden, New Jersey (hereinafter the "1300 Building," and the "1350 Building," respectively). *See* Local Rule 56.1 Statement of Material Facts of George E. Norcross, III, and the Camden County Democratic Committee (filed Feb. 5, 1999), ¶ 3 (hereinafter, "CCDC's R. 56.1"); *see also* Complaint, ¶ 18; Deposition of Rahn J. Farris (dated Aug. 4, 1998) at 15, 90. In August, 1989, the County of Camden (the "County" or "Camden County") leased 20,000 square feet of the 1300 Building from Farris for the purpose of operating and housing the County's Reach Program, which was operated by an employee of the County, William Maguire ("Maguire"). *See* Farris Dep. (Aug. 4, 1998) at 219–20, 222–23. The lease term on the 1300 Building was from October 1, 1989, to July 31, 1992, with monthly rental payments of $25,000, resulting in an annual rental payment of $300,000. *See* Plaintiff's Exhibits in Opposition of Motion for Sanctions (filed Jan. 20, 1998) ("Pl. Sanction Opp."), Exh. 8 (1300 Building Lease).

In March, 1990, the County leased an additional 7500 square feet in the 1300 Building from Farris for the purpose of operating the County's Division for Children. *See* Pl. Sanctions Opp., Exh. 9 (Additional 1300 Building Leases); *see also* Farris Dep. (Aug. 4, 1998) at 223. These additional leases provided for monthly rental payments at a rate of $12 per square foot. *See* Sanctions Opp., Exh. 9. Defendant, Judith Palombi ("Palombi"), was the director of the County's Division for Children, and her office was located in the 1300 Building. *See* Palombi's Local Rule 56.1 Statement of Material Fact (filed Apr. 30, 1999), ¶ 4.

In December, 1989, the County leased 20,000 square feet in the 1350 Building in order to house the County's Business Incubator Program. *See* Certification of Anthony Valenti, Esq. (filed Apr. 30, 1999), Exh. 12 (Internal County Memorandum from Thomas A. Mitchell to Stephen R. Sasala (dated June 6, 1991)). The 1350 Building lease called for a rental payment of $12.00 per square foot, which corresponded to a $20,000 per month rental payment, or an annual rental payment of $240,000. *See id.* The term of the 1350 Building lease ran from December 1, 1989, to November 30, 1992. *See id.* The County and Farris dispute whether or not the County officially took possession of the 1350 Building because, although the director of the Business Incubator program, Ben Smallwood, had entered the premises,

the County had terminated the funding for the program before it officially began to operate. *See id.; see also* Farris Dep. (Aug. 4, 1998) at 227–30.

In October, 1991, Farris and the County entered into a new lease on the 1350 Building which superceded the original lease executed in December, 1989. *See* Valenti Cert., (1999), Exh. 13 (1350 Building Lease (dated Oct. 10, 1991)). In December, 1991, Defendant, Thomas Mitchell ("Mitchell"), Assistant County Counsel, assured Farris that, notwithstanding the termination of Ben Smallwood's program, the County intended to reenter the premises in January, 1991. *See* Farris Dep. (Aug. 4, 1998) at 230; *See* Deposition of Thomas A. Mitchell (dated Dec. 10, 1998) at 204.

Farris hired Mark Willis ("Willis") as building manager for both the 1300 and the 1350 Buildings. *See* Deposition of Mark Willis (dated Sept. 17, 1998) at 58. Farris gave Willis "full responsibility for the day to day operations of the buildings[,] and [Willis] was responsible for such items as collecting rent, paying expenses, maintenance and receiving the mail." *See* Plaintiff's Local Rule 56.1 Statement of Material Facts (filed Feb. 5, 1999) at 9; Willis Dep. (Sept. 17, 1998) at 11–12.

In the fall of 1991, "Farris was mailed 10 tickets to a political fundraiser [sic]" which requested that he make a $10,000 political contribution. *See* Farris Dep. (Aug. 4, 1998) at 196–99; *see also* Pl. R. 56.1 at 9. The parties dispute whether the political fund-raiser was for the benefit of Congressman Robert Andrews' re-election campaign. Farris disregarded the solicitation. About a month later, Farris received a similar solicitation in the mail. *See* Pl. R. 56.1 at 9. Farris testified at his August 12, 1998, deposition that Maguire told him the tickets were sent by Defendant, George E. Norcross, III ("Norcross"), the Chairman of Defendant, Camden County Democratic Committee (the "CCDC"). *See* Farris Dep. (Aug. 4, 1998) at 195.

Farris testified that, in September or October, 1991, Maguire "advised [him] that Norcross wanted to meet him and [Maguire] set up a meeting with Norcross for the next day[.]" *See* Farris Dep. at 190; *see also* CCDC R. 56.1, ¶ 5. Farris testified that, "[a]t the meeting, Norcross discussed the tickets and questioned how he could get Farris to be a team player." *See* Pl. R. 56.1 at 10. Specifically, Farris testified:

> I walked in his office ... And he said to me, something to the point of "How do I get you to be a team player?"
>
> .    .    .    .    .
>
> I said, "If you're talking about the tickets, I'd love to be a team player, but I can't afford the tickets at this point in time." He told me how important it was that tickets be sold to get their candidate wherever that candidate is going ... And I told him, "I put too much money in my building and I really couldn't afford it." He said, "How much do you owe on your building?" Somehow a number, seven-fifty, seven hundred thousand came up ... And his remark to me was, "I'll buy your building for seven hundred thousand." I said, "I can't sell you the building. I have more [in] liens [than] ... that. I couldn't sell it, and I'm not here to sell the building." At that point in time, he just put his hands on his desk. He said, "This meeting's over."

*See* Farris Dep. (Aug. 4, 1998) at 191–92.

When Farris returned to his office at the 1300 Building after his meeting with Norcross, "Maguire was already there waiting." *See* Pl. R. 56.1 at 10; *see also* Farris Dep. (Aug. 4, 1998) at 193. Willis arrived at Farris's office also. *See* Willis Dep. (Sept. 24, 1998) at 146. Farris and Willis testified that Maguire was aware of the outcome of Farris's meeting with Norcross, even without having been told by Farris. *See* Farris Dep. (Aug. 4, 1998) at 193; Willis Dep. (Sept. 24, 1998) at 146. Willis further testified that Maguire stated that Farris "was going to start having

trouble with [Norcross.]" *See* Willis Dep. (Sept. 24, 1998) at 153.

Willis also testified that Palombi "was aware of [Farris's] meeting with Norcross and what had transpired." *See* Pl. R. 56.1 at 11; *see also* Willis Dep. (Sept. 24, 1998) at 115. According to Willis, Palombi also stated that she had a letter from Norcross stating that if Farris did not make the requested political contributions the County was going to move out of the 1300 Building. *See* Willis Dep. (Sept. 24, 1998) at 116–22.

Palombi testified that she did have conversations with Willis and Farris regarding political fund-raisers. *See* Deposition of Judith Palombi (dated Dec. 28, 1998) at 86–87. Palombi, however, denied receiving a letter from Norcross about Farris's failure to make political contributions. *See id.* at 117. Palombi testified:

> I know there was no letter, absolutely no letter. I have no idea what Mark Willis is talking about when he mentions a letter regarding Mr. Norcross. I have never had . . . a letter from George Norcross involving any fund-raising requesting that I have anything to do with Rahn Farris or Mark Willis, never.

*Id.*

Willis testified that shortly after Farris's meeting with Norcross the County began to withhold rent due under the 1300 and the 1350 Building leases. *See* Willis Dep. (Sept. 24, 1998) at 39–40. Willis further testified that Maguire stated that "Norcross had directed the rents be held up . . . ." *See* Pl. R. 56.1 at 11; Willis Dep. (Sept. 24, 1998) at 155.

Stephen R. Sasala ("Sasala"), the County Administrator for Camden County from April 1, 1991, to March 31, 1994, testified that, in 1991, the Board of Chosen Freeholders decided to renegotiate a number of the County's leases. *See* Deposition of Stephen R. Sasala (dated Nov. 13, 1998) at 20, 22. Sasala, who had been appointed County Administrator by the Board when it was controlled by the Republican Party, testified:

> [The decision to renegotiate Farris's leases was made] in 1991 when the Republicans controlled the freeholder board, but it certainly carried over into 1992 [after the Democrats gained control of the Board].

*Id.* at 22. Sasala further testified:

> Q. [By Mr. Zarrillo] And the reason that you understood why the Republican administration wanted to renegotiate the leases was?
>
> A. To consolidate county office space.
>
> Q. Was there anything about the amounts of money being paid on those leases that was a motivating factor, as far you know?
>
> A. I believe there was also at the time an understanding that the leases were excessive, and that they wanted to cut the amount on a per square foot basis.
>
> Q. In 1992 there was a transition to a Democratic freeholder board. Correct?
>
> A. Correct
>
> .   .   .   .   .
>
> Q. Were you aware of the rationale as to why the freeholder board wanted to continue the process of renegotiating leases that was begun in the Republican administration . . . ?
>
> A. Basically because they were inflated leases, they were very expensive . . .

*Id.* at 22–23.

Sasala testified that Mitchell and Defendant, Joseph Benton ("Benton"), were directed to conduct the actual renegotiations with Farris. *See id.* at 25. In March, 1992, Benton "contacted Farris and advised him that he had to renegotiate all of his leases with the County[.]" *See* Pl. R. 56.1 at 12; *see also* Farris Dep. (Aug. 12, 1998) at 331–32; Deposition of Joseph Benton (Dec. 9, 1998) at 70–73, 106. Farris testified that Benton stated that "[i]t was in [his] best interest . . . to renegotiate with the County, or they're [sic] going to move, and [Farris was] going to be out a

lot of money." *See* Farris Dep. (Aug. 12, 1998) at 332. Farris further testified that Benton offered him "five dollars a square foot." *Id.* at 331. Benton, however, testified that he offered Farris four to five dollars less per square foot than the existing rental rate. *See* Benton Dep. at 70–73, 106.

After speaking with Benton, Farris contacted Mitchell. *See* Farris Dep. (Aug. 12, 1998) at 332. Farris testified:

> Tom Mitchell got back to me in a couple of days. He said, "They want to renegotiate with you." I said, "Why?" He said, "Because that's what George [Norcross] wants to do."

*Id.* Mitchell testified, however, that he did not tell Farris that Norcross directed that Farris's leases be renegotiated. *See* Mitchell Dep. at 103–04.

Regarding the renegotiations, Sasala testified that Farris complained to him that he thought that his leases with the County were being renegotiated because he had failed to make political contributions. *See* Sasala Dep. at 26–28. Sasala further testified:

> [Farris] called me and pleaded with me and said he could not get [the rent] paid and was there anything I could do about it.
>
> .      .      .      .      .
>
> I recall having a conversation with [Defendant, Louis Bezich ("Bezich")]. And his response was "I'll take care of it."
>
> .      .      .      .      .
>
> Q. [By Mr. Zarrillo] ... During the course of this conversation with Mr. Bezich, do you recall him saying to you that the checks were on his desk for Mr. Farris?
> A. That sounds familiar. I think so ... I believe the checks were cut[.]

*Id.* at 29–31.

Through the renegotiations with Farris, the County was seeking the inclusion of two specific terms in the renegotiated lease for the 1300 Building. First, the County was seeking a downward-spiraling, reduced rental rate. *See* Sasala Dep. at 24. Sasala testified that the rental provision, which reduced the rent per square foot by $.25 each year for the first three years of the lease, was his idea. *See id.* at 95–96. Second, the County was seeking a clause in the renegotiated leases that permitted the County to terminate the lease on thirty-days notice to Farris. *See* Mitchell Dep. at 222. Sasala testified that the thirty-day termination provision "was tied into the county having maximum flexibility, because there was some discussion [about consolidating office space] in the RCA building[,]" located in Camden, New Jersey. *See* Sasala Dep. at 98–99.

During the renegotiations of Farris's leases with the County, Farris testified that the County was withholding rent due under the original 1350 Building lease. *See* Farris Dep. (Aug. 4, 1998) at 231; Willis Dep. (Sept. 22, 1998) at 146–47. Farris further testified that Mitchell and Benton represented to him that, if he did not agree to the County's terms in the renegotiated leases, the County would vacate the 1300 Building, immediately relocate to the RCA building, and withhold the back rent indefinitely. Specifically, Farris testified:

> My leases were not up in the [1300] building until August[, 1992]. I was renegotiated in March and April[, 1992]. And as far as I was concerned, I was forced to sign that lease, "Or we're moving to the RCA Building and you will not get your money."

*See* Farris Dep. (Aug. 12, 1998) at 335.

Sasala testified that the County could not immediately relocate its offices to the RCA building in April, 1992. *See* Sasala Dep. at 64–66. Farris testified that after he agreed to the County's terms in the renegotiated 1300 Building leases, Mitchell apologized to him for misleading him about the availability of the RCA building. *See* Farris Dep. (Aug. 4, 1998) at 30–32.

Mitchell denied making any such apology. *See* Mitchell Dep. at 211.

While Farris and the County were renegotiating the 1300 Building lease, Farris was being solicited for political contributions. Willis testified that he "received a phone call from Defendant, Phyllis Pearl [('Pearl')]." *See* Pl. R. 56.1 at 15. "Pearl advised that she was from Jack Gallagher Associates and was calling on behalf of Rob Andrews for Congress." *Id.* Willis testified that "Pearl referenced the tickets that were mailed to Farris and his 'conflict with the County.'" *Id.* (quoting Willis Dep. (Sept. 24, 1998) at 92–95). "Pearl requested that Farris make a $3,000 contribution and advised if she got a check for $3,000 that day, she could have Farris's rent paid by the end of the day." *Id.* Willis testified that "Pearl followed up a couple days later in person." *Id.* Farris did not make the contribution. *See id.*

Pearl testified at her February 25, 1999, deposition that she did make fund-raising calls for the CCDC, but that she did not solicit a $3000 contribution from Farris, promising to have his overdue rent paid. *See* Deposition of Phyllis Pearl (dated Feb. 25, 1999) at 66, 84, 90. Specifically, Pearl testified:

Q. [By Mr. Valenti] Do you know if you ever spoke to Mark Willis on the phone?

A. I have no idea. I'd say no. I mean, he never identified himself. You know, I call an office. I don't know who I'm talking to. I ask for the person I need to speak to, they say, they're not here. I hang up.

Q. Do you have any specific recollection of speaking to anyone at Admiral Wilson Boulevard in response to a call that you were placing for the CCDC?

A. No.

.  .  .  .  .

Q. You've never said to anyone that their contribution would be noticed by the party?

A. .... I would probably say to somebody, I'm sure people will notice if

you're helpful. That's probably the words I would use

.  .  .  .  .

Q. [Did you ever speak] with Judy Palombi concerning any rent issues with Admiral Wilson Boulevard?

A. No.

*Id.* at 66–67, 88–90. Pearl further testified that she did not "fund-raise" on behalf of Congressman Andrews. *See id.* at 103.

In February, 1992, Farris made a $1,500 contribution to the CCDC. *See* Exhibits in Support of Brief of Summary Judgment on Behalf of Norcross and the CCDC, Exh. R, (Check (dated Feb. 25, 1992)). Farris testified that Theresa Kirby, a loan officer at Commerce Bank, had convinced him to make the contribution. *See* Farris Dep. (Aug. 12, 1998) at 499. The contribution was for the purchase of three tickets to a roast held by the CCDC in Norcross's honor. *See id.; see also* Exhibits in Support of Brief of Summary Judgment on Behalf of Norcross and the CCDC, Exh. R, (Check (dated Feb. 25, 1992)).

Farris and Willis testified that, even after Farris agreed to the renegotiated lease terms for the 1300 Building, "the County continued to withhold the rent that it owed Farris" on the 1350 Building. *See* Pl. R. 56.1 at 15. Both Farris and Willis repeatedly telephoned Bezich, the Chief Operating Officer and Treasurer of Camden County, inquiring about the overdue rent. *See id.* at 15–16; *see also See* Deposition of Louis Bezich (dated Feb. 23, 1999) at 35–38. Bezich testified that he had no recollection of receiving any such calls. *See* Bezich Dep. at 66. Willis also repeatedly called Mitchell to inquire about the rent. *See id.* at 16. Willis secretly tape recorded a number of his telephone conversations with Mitchell. *See id.; see. also* Pl. Sanctions Opp. Exh. 13 (Transcript of Tape Recorded Conversations).

On April 1, 1992, at the same time that Farris and the County were renegotiating the 1300 Building lease, Mitchell, on behalf

of the County, informed Farris by letter that the County was terminating the 1350 Building lease. *See* Valenti Cert., Exh. 15 (Letter to Farris from Mitchell (dated Apr. 1, 1992)). At the time, the County was withholding the rent due for the months of January, February, and March, 1992. *See* Farris Dep. (Aug. 12, 1998) at 361, 392.

All of Farris's leases with the County contained a provision entitled "Obligation Subject to the Availability and Appropriation of Funds." *See* Valenti Cert., Exh. 13, ¶ 27. The provision provided, in relevant part:

> "[I]t is mutually understood and agreed between the parties that all financial obligations undertaken by the [County] under [the 1350 Building] lease including, but not limited to rent, are made subject to the availability and appropriation of sufficient funds by the by the Board of Chosen Freeholders . . ."

*Id.* Exercising this provision, the County terminated the 1350 Building lease, effective May 31, 1992. *See* Valenti Cert., Exh. 14; *see also* Certification of John T. Coyne, Esq. (filed Apr. 30, 1999), Exh. E. In April, 1992, the County remitted to Farris the rent due under the 1350 Building lease for the months of January, February, and March, 1992. *See* Compl., ¶ 62.

In November, 1992, Farris and the County entered into another lease for the 1350 Building. *See* Valenti Cert., Exh, 17. The renegotiated 1350 Building lease contained the reduced rental rate and thirty-day termination provisions that the County had required in the renegotiation of the 1300 Building lease. *See id.* Farris testified that, prior to entering into the renegotiated 1350 Building lease, "[i]n the fall of 1992, [he] was visited by Stephen Umbrell, the Executive Vice President of Commerce

Bank." *See* Pl. R. 56.1 at 19; *see also* Valenti Cert., Exh. 16 (Certification of Rahn J. Farris (dated Jan. 29, 1999), ¶ 3). At the time, Commerce Bank held notes secured by mortgages on the 1300 and 1350 Buildings. *See, e.g.,* Farris Dep. (Aug. 12, 1998) at 387. "Mr. Umbrell requested that Farris execute an assignment of lease payments for the 1350 Building in favor of Commerce Bank." *See* Pl. R. 56.1 at 19. "Farris advised Umbrell that Camden County had vacated the building and that there was no longer a tenant in the 1350 building." *Id.* Umbrell insisted, and Farris acquiesced in executing an assignment of rents in favor of Commerce Bank. *See id.* The County, after entering into the renegotiated lease with Farris, made its rental payments "directly to Commerce Bank" under the assignment of lease payments. *Id.*

On February 2, 1994, unable to make the payments on the mortgages covering the 1300 and 1350 Buildings, as well as the commercial loans Farris had obtained for unrelated business ventures, and judgment liens filed by numerous creditors, Farris filed for bankruptcy. *See* Valenti Cert., Exh. 14 (Discharge of Debtor (dated June 2, 1997)). On June 2, 1997, Farris's debts were discharged by order of the United States Bankruptcy Court for the Eastern District of Pennsylvania. *See id.; see also County of Camden v. Rahn J. Farris,* Civil Action No. 97–3297(SMO), unpubl. slip op. (D.N.J. Jun. 29, 1998).

On October 6, 1997, Farris filed a thirty-five count Complaint[3] in this Court alleging both federal and pendent state law causes of action against Defendants, Camden County, Norcross, the CCDC, Louis Bezich, Thomas Mitchell, Judy Palombi, and Phyllis Pearl. *See* Compl., ¶¶ 6–17.[4]

---

**3.** This case had originally been consolidated with *County of Camden v. Rahn J. Farris,* Civil Action No. 97–3297(SMO). On June 29, 1998, I granted Farris's motion for summary judgment on the County's claims for breach of contract, breach of the implied covenant of good faith and fair dealing, breach of implied warranties, unjust enrichment, fraud, rescis-

sion, constructive trust and violations of the New Jersey Consumer Fraud Act, arising out of the renegotiated 1300 and 1350 Building leases. *See County of Camden v. Rahn J. Farris,* Civil Action No. 97–3297(SMO), unpubl. slip op. (D.N.J. Jun. 29, 1998).

**4.** Farris had also named as defendants, State Senator John Adler, Jack Gallagher, Galla-

On December 14, 1998, Magistrate Judge Joel B. Rosen granted Farris's motion to voluntarily dismiss Counts XX through XXXV of the Complaint, namely, Farris's claims for violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962, and its New Jersey analogue, N.J. Stat. Ann. § 2C:41–2. *See* Order of Mag. Judge Rosen (filed Dec. 14, 1998). Farris's remaining counts include claims for: (1) rescission or reformation of the renegotiated 1300 and 1350 Building leases on the basis of economic duress, fraud, misrepresentation, and unconscionability, Counts I–III; (2) breach of the original 1300 and 1350 Building leases, as well as the renegotiated 1300 Building lease, Counts IV–V, VII, XI; (3) common law fraud against the County, Bezich, Mitchell, and Palombi, Count VI; (4) tortious interference with contract and prospective economic advantage against Bezich, Mitchell, and Palombi, Count VIII; (5) tortious interference with contract and prospective economic advantage against Norcross and the CCDC, Counts IX–X; (6) civil conspiracy to tortiously interfere and defraud against Norcross, the CCDC, Bezich, Mitchell, and Palombi, Count XII; (7) civil conspiracy to defraud against Camden County, Norcross, and the CCDC, Count XIII; (8) civil conspiracy to tortiously interfere against Norcross, the CCDC, and Pearl, Count XIV; and (9) civil conspiracy to extort political contributions and to deprive Farris of his real property against Norcross, the CCDC, Bezich, Mitchell, Palombi, Pearl, and the County, Counts XV–XIX. *See* Compl, Count I–XIX.

On December 8, 1998, Norcross and the CCDC moved, pursuant to 28 U.S.C. § 1927 and the Court's inherent powers, for the imposition of sanctions and attorneys' fees against counsel for Farris, contending that Farris's claims against Norcross and the CCDC lacked an arguable basis in law and fact, and that counsel for Farris had misrepresented the facts of the case in Farris's Rule 26 initial disclosures. *See* Notice of Motion (filed Dec. 8, 1998). While that motion was pending, on February 5, 1999, Norcross and the CCDC also moved for summary judgment on all claims asserted against them. *See* Notice of Motion (filed Feb. 5, 1999). Farris opposed the motion on the merits and filed an application pursuant to Rule 56(f) to adjourn Norcross's and the CCDC's motion until the conclusion of discovery.[5] *See* Rule 56(f) Certification of Jerald R. Cureton, Esq. (filed Feb. 5, 1999).

After the close of discovery, on April 22, 1999, Mitchell filed a Notice of Intent to submit a dispositive motion. *See* Notice of Intent (filed Apr. 22, 1999). Subsequently, on May 10, 1999, Mitchell filed a motion for summary judgment on all claims. *See* Notice of Motion (filed May 10, 1999). Likewise, on April 30, 1999, Camden County filed a motion for summary judgment on all claims asserted against it.[6] *See* Cam-

gher Associates, Inc., and Joseph Benton. Farris voluntarily dismissed his claims against Senator Adler, and settled his claims with Benton, Gallagher, and Gallagher Associates, Inc. *See* Consent Order (filed Nov. 12, 1998); Stipulations of Dismissal (filed Feb. 4, and 11, 1999).

5. Discovery in this case closed on February 28, 1999. *See* Final Scheduling Order (filed Jan. 28, 1999).

6. On April 30, 1999, Palombi filed a motion for summary judgment without complying with the motion procedure set forth in Appendix N of the Local Civil Rules of this Court. *See* Palombi's Notice of Motion (filed Apr. 30, 1999). On January 28, 1999, Magistrate

Judge Rosen filed the Final Scheduling Order in this case, ordering that dispositive motions be filed, pursuant to Appendix N, on or before May 1, 1999. *See* Final Scheduling Order (filed Jan. 28, 1999). Appendix N requires a moving party to send its notice of motion, brief, affidavits and other supporting documentation to all adversaries. *See* L. Civ. R.App. N. The non-moving party has ten days to prepare its opposition papers and to send such papers to the moving party. *See id.* The moving party thereafter has seven days to prepare its reply papers, if any. *See id.* "After the motion has been fully briefed and is ready for submission to the Court, [the entire motion packet] ... [is] sent to the Clerk" for filing. *Id.* On March 31, 1999, the Local Civil Rules of this Court were amended, making

den County's Notice of Motion (filed Apr. 30, 1999). Farris opposed both motions contending that genuine disputed issues of material fact exist, precluding the entry of summary judgment in favor of Mitchell and the County.

## III. LEGAL STANDARD GOVERNING MOTIONS FOR SUMMARY JUDGMENT

"On a motion for summary judgment, the court must determine whether the evidence shows that 'there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Abraham v. Raso*, 183 F.3d 279, 287 (3d Cir.1999) (citing Fed.R.Civ.P. 56(c)). "Any factual dispute invoked by the nonmoving party to resist summary judgment must be both material in the sense of bearing on an essential element of the plaintiff's claim and genuine in the sense that a reasonable jury could find in favor of the nonmoving party." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). In opposing summary judgment, a party "must do more than simply show that there is some metaphysical doubt as to material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), but a court should not prevent a case from reaching a jury simply because the court favors one of several reasonable views of the evidence. *Abraham*, 183 F.3d at 287. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505; *see also Abraham*, 183 F.3d at 287. "Thus, while the nonmoving party must present enough evidence to demonstrate a dispute is genuine, all inferences in interpreting the evidence presented by the parties should be drawn in favor of the nonmoving party." *Abraham*, 183 F.3d at 287 (citing *Boyle v. County of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir.1998)). "Cases that turn crucially on the credibility of witnesses' testimony in particular should not be resolved on summary judgment." *Id.*

If the nonmoving party fails to oppose the motion by written objection, memorandum, affidavits and other evidence, the Court "will accept as true all material facts set forth by the moving party with appropriate record support." *Anchorage Assocs. v. Virgin Islands Bd. of Tax Rev.*, 922 F.2d 168, 175 (3d Cir.1990) (quoting *Jaroma v. Massey*, 873 F.2d 17, 21 (1st Cir.1989)). Even where the non-moving party has failed to establish a triable issue of fact, summary judgment will not be granted unless "appropriate." Fed. R.Civ.P. 56(e); *see Anchorage Assocs.*, 922 F.2d at 175. Rule 56(e) of the Federal

the Appendix N procedure the required, rather than the optional, procedure for filing dispositive motions. *See* Order of Chief Judge Anne E. Thompson (filed Mar. 31, 1999). Thus, under Appendix N, a moving party must serve its moving papers on its adversary, at least, seventeen days prior to the dispositive motion deadline set forth in the Scheduling Order. Here, Palombi filed her notice of motion with the Court on Friday, April 30, 1999. *See* Palombi's Notice of Motion (filed Apr. 30, 1999). In a cover letter to the Court, dated April 29, 1999, counsel for Palombi stated that he had sent a copy of the moving papers to counsel for Farris by overnight courier. *See* Letter to the Court from Scott A. Krasny, Esq. (dated Apr. 29, 1999). The cover letter, however, set forth no reason for counsel's failure to file his dispositive motion on behalf of Palombi before April 30, 1999. *See id.*

Thus, counsel for Farris did not receive notice of Palombi's intent to file a motion for summary judgment until April 30, 1999, the day before the dispositive motion deadline. In addition, and most troubling, counsel for Palombi did not contact his adversary to seek the consent of [counsel for] Plaintiff prior to serving the motion. *See* Letter to the Court from Anthony Valenti, Esq. (dated May 6, 1999). Therefore, because counsel for Palombi failed to comply with the Final Scheduling Order, and has provided this Court with no good cause excusing the untimely filing of Palombi's motion for summary judgment, the Court shall not consider the motion, and it shall be dismissed as untimely filed. *See Chiropractic Alliance v. Parisi*, 164 F.R.D. 618 (D.N.J.1996) (holding that dispositive motions filed beyond the deadline set forth in the Court's Scheduling Order shall be dismissed).

Rules of Civil Procedure requires that the case be evaluated on its merits, with summary judgment being granted for the movant only if they are entitled to a judgment as a matter of law. *See Anchorage Assocs.*, 922 F.2d at 175.

## IV. DISCUSSION

### A. *Defendants' Motions for Summary Judgment*

1. *Norcross's and the CCDC's Motion for Summary Judgment and Application of the Coconspirator Exception to the Hearsay Rule set forth in Rule 801(d)(2)(E) of the Federal Rules of Evidence*

#### a. *Counts IX and X, Tortious Interference*

In Count IX of the Complaint, Farris alleges that Norcross "directed, encouraged, and otherwise caused Defendant Camden County to breach its lease agreements with Plaintiff by failing to make rent payments for months at a time and by vacating the 1350 Building prior to the end of the 1350 Building Lease." *See* Compl., ¶ 139. Farris also alleges in Count IX that Norcross "directed, encouraged, and otherwise caused Defendant Camden County to engage in coercive and fraudulent tactics so as to cause Plaintiff to enter the [renegotiated leases]." *Id.*, ¶ 140. Farris alleges that the "actions of Norcross were intentional and malicious and were engaged in for various reasons including to facilitate a scheme to acquire Plaintiff's 1300 Building, to coerce and encourage Plaintiff into making political contributions, and to retaliate against Plaintiff's prior failures to make contributions ..." *Id.*, ¶ 141. In Count X, Farris makes the same allegations against the CCDC. *See id.*, Count X.

In support of their motion for summary judgment, both Norcross and the CCDC contend that "plaintiff has no evidence whatsoever that Norcross or the [CCDC] interfered in any way with [Farris's] lease agreements with the County of Camden."

*See* Norcross's and the CCDC's Brief in Support of Motion for Summary Judgment (filed Feb. 5, 1999) ("CCDC's Brief") at 19. In addition, in response to Farris's contention that the hearsay statements of County employees are sufficient to create a dispute of material fact, Norcross and the CCDC contend that these statements are inadmissible to prove that Norcross and the CCDC tortiously interfered with Farris's leases with the County. *See* Reply Brief of Norcross and the CCDC (filed Feb. 5, 1999) at 6–11.

■ Under New Jersey law, "[t]o state a claim for tortious interference with business relationships, a plaintiff must allege that: (1) it had a continuing or prospective economic relationship or reasonable expectation of economic advantage; (2) the defendant knew of such relationship of expectancy; (3) the interference and harm inflicted were done intentionally and with "malice" in the sense of conduct that is wrongful and without justification or excuse; (4) if not for the interference, it was reasonably probable that plaintiff would have realized its economic advantage; and (5) the plaintiff was injured as a result of defendant's conduct." *Eli Lilly and Co. v. Roussel Corp.*, 23 F.Supp.2d 460, 493–94 (D.N.J.1998) (citing *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 186 (3d Cir.1992)); *see Varrallo v. Hammond, Inc.*, 94 F.3d 842, 848 (3d Cir.1996); *Printing Mart–Morristown v. Sharp Electronics Corp.*, 116 N.J. 739, 751–52, 563 A.2d 31 (1989); *see also Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1167 (3d Cir.1993); *Lithuanian Commerce Corp. v. Sara Lee Hosiery*, 179 F.R.D. 450, 482–83 (D.N.J.1998).

Norcross and the CCDC concede for the purposes of this motion that "plaintiff's leases with the County of Camden created a reasonable expectation on the part of plaintiff that he would be paid some amount of rent to the end of [the] term." *See* CCDC's Brief at 19. These defendants, however, contend that Farris has

failed to produce any admissible evidence of the remaining elements of a claim for tortious interference. *See id.*

In response to this contention, Farris contends that the statements of Mitchell, Palombi, Maguire and Pearl, are admissible to prove that Norcross and the CCDC tortiously interfered with Farris's leases with the County. *See* Plaintiff's Brief in Opposition to Norcross's and the CCDC's Motion for Summary Judgment (filed Feb. 5, 1999) at 30–31, 33–34. Specifically, Farris contends that "[t]he testimony of Willis and Farris is that they were informed by Maguire, Palombi[,] and Mitchell, on various occasions that the withholding of rents and the renegotiation of [Farris's] leases [were] at the direction of Norcross because Farris failed to make the [political] contributions requested of him." *Id.* at 31. Norcross and the CCDC contend to the contrary that the statements of Palombi, Mitchell, and Maguire, are inadmissible hearsay. *See* Reply Brief of Norcross and the CCDC at 6–11.

■ It is well settled that, in opposing a motion for summary judgment, "[a] plaintiff ... must point to admissible evidence that would be sufficient to show all elements of a prima facie case under applicable substantive law." *Clark v. Modern Group Ltd.*, 9 F.3d 321, 326 (3d Cir.1993) (citation omitted). Consistent with this well settled principle of law, in *Philbin v. Trans. Union Corp.*, 101 F.3d 957 (3d Cir. 1996), the Third Circuit noted that "a hearsay statement that is not capable of being admissible at trial should not be considered on a summary judgment motion[.]" *Blackburn v. United Parcel Service, Inc.*, 179 F.3d 81, 95 (3d Cir.1999) (construing *Philbin*, 101 F.3d at 961 n. 1). When a party seeking to avoid summary judgment has pointed to arguably hearsay evidence

in the record, a District Court "must first determine whether any [of the non-moving party's] evidence ... is admissible, based as it is on hearsay and, in some instances, multiple hearsay." *Blackburn*, 179 F.3d at 95 (citing *Philbin*, 101 F.3d at 961 n. 1). "Then, [a District Court] must determine whether the hearsay evidence that might be admissible at trial is sufficient to defeat [the moving party's] summary judgment motion or whether judgment [should] properly [be] entered in favor of [the moving party]." *Id.* (citation omitted).

As a preliminary matter, I note that Farris contends that any statements made by Palombi, Mitchell, and Maguire, made within the scope of their employment, are admissible against the County as admissions by a party opponent under Rule 801(d)(2)(D) of the Federal Rules of Evidence. *See* Plaintiff's Brief in Opposition to Norcross's and the CCDC's Motion for Summary Judgment (filed Feb. 5, 1999) at 33. Building on this contention, Farris argues that these statements are also admissible against Norcross and the CCDC under Rule 801(d)(2)(E) because he has alleged that Norcross, the CCDC, and the County are coconspirators. *Id.* These contentions are without merit in light of this Court's conclusion that as a matter of law the County cannot conspire with Norcross and the CCDC to tortiously interfere with Farris's leases, to extort political contributions, to interfere with Farris's real property, or to defraud. *See* § IV.A.2.f–j *infra.*

Therefore, because Rule 801(d)(2)(D) cannot serve as a basis for the admissibility of Mitchell's, Palombi's and Maguire's statements against Norcross and the CCDC, Farris must demonstrate that these statements satisfy the requirements of Rule 801(d)(2)(E),[7] independent of the County's alleged role as a coconspirator.

---

7. Rule 801(d)(2)(E) provides, in relevant part: A statement is not hearsay if ... [t]he statement is offered against a party and is ... (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy. The contents of the statement shall be considered but are not

alone sufficient to establish ... the existence of the conspiracy and the participation therein of the declarant and the party against whom the statement is offered under subdivision (E).
*See* Fed. R. Ev. 801(d)(2)(E).

In addition, because Farris has not alleged that Maguire was a party to the civil conspiracy to tortiously interfere with his contractual and prospective contractual relationship with the County, Rule 801(d)(2)(E) cannot serve as the basis for the admissibility of Maguire's hearsay statements.[8] Farris has failed to assert an alternative basis for the admissibility of Maguire's statements, either under Rule 801, as non-hearsay, or the exceptions to the hearsay rule in Rules 803 and 804. *See* note 6 and accompanying text. Therefore, because Maguire's statements are clearly hearsay "that is not capable of being admissible at trial, [his alleged statements shall] not be considered [in resolving this] . . . summary judgment motion[.]" *Blackburn*, 179 F.3d at 95 (citing *Philbin*, 101 F.3d at 961 n. 1).

Turning to the alleged statements of Palombi and Mitchell, Farris contends that these statements, as well as those of Phyllis Pearl, are admissible under Rule 801(d)(2)(E) of the Federal Rules of Evidence. The specific statements at issue are set forth below.

Willis testified at his September 22, 1998, deposition that:

Late, I believe in '91ish, certainly early '92ish[, Farris received tickets to a political fund raiser]. [When] all that had started to surface, [Palombi] came in and made a representation that certainly it would be in our best interest to buy tickets. She had a letter that . . . she read . . . to me. She said it was from the chairman. And I joked with her, Frank Sinatra, and she said, "No George Norcross."

. . . . .

She basically said they were going to move from the facility . . . It was basi-cally that, she read the letter, that they would virtually move from the building . . . if Rahn didn't contribute. [After] she read it, she folded the letter up, I remember she put it inside a day planner. We sat there and talked.

. . . . .

She basically made it very clear. The only time she used [Norcross's] name was for that particular letter. She's been to headquarters, they're expecting Rahn to put out, it was kind of unavoidable. She was making it very clear that those tickets on Rahn's desk weren't going to go away, I mean they just weren't going to go away . . . In terms of the tickets she made it very clear that it was in Rahn's interest just to buy them.

Q. [By Mr. Timpone] She said it was in Rahn's best interest to buy the tickets?

A. [By Mr. Willis] Yes.

Q. Did she link the continuing idea of the County vacating?

A. Right. . . .

. . . . .

Q. Did she explain to you how your contributions to the fund . . . would stop [her] Program from moving out?

A. She just basically made it very clear at that point in time we'd be on-board. . . .

. . . . .

Q. Did she say if you don't buy these tickets, [her program] would move [out of the 1300 Building]?

A. Yes. . . .

*See* Willis Dep. (Sept. 22, 1998) at 116–126.

At his September 24, 1998, deposition, Willis testified that he received, on behalf of Farris, a telephone solicitation for politi-

---

**8.** Maguire is not a party to this action. *See* Compl. In response to a subpoena to testify at a discovery deposition, Maguire, through counsel, invoked his Fifth Amendment privilege and refused to be deposed. *See* Exhibits in Support of Brief of Summary Judgment of Norcross and the CCDC, Exh. O (Letter to William M. Tambussi, Esq., from Kathleen Kane, Esq. (dated Oct. 16, 1998)). Maguire's basis for invoking his Fifth Amendment privilege was that he "was the subject of a federal criminal investigation surrounding his employment with Camden County." *Id.*

cal contributions from Pearl. *See* Willis Dep. (Sept. 24, 1998) at 94. Willis testified:

Q. [By Mr. Tambussi] Tell me what Phyllis Pearl said?

A. [By Mr. Willis] Regarding the collection of our rent, that $3000 could facilitate the rent ...

Q. When did Phyllis Pearl tell you?

A. Early '92.

Q. In person or on the telephone?

A. Once in person, once on the phone.

. . . . .

Q. What did she say to you?

A. It was a follow-up of our conversation on the phone regarding the $3000.

Q. So she called you first?

A. It was a solicitation on the phone first ... Basically identified who she was, where she was from. [She said she was Phyllis Pearl] [f]rom Jack Gallagher Associates. And she was calling on behalf of Rob Andrews for Congress ... She basically was aware of the tickets that were mailed to us ...

. . . . .

I don't remember the exact pitch. She caught me off guard ... She was aware ... or our difficulty [in collecting the money owed from the County].

. . . . .

And she immediately solicited, ... "Would it be possible to get a check made out on behalf of Rob Andrews[.]"

. . . . .

She basically said to me, "If I get the $3000 today, I could get your rent by the end of the day[.]" ... That was as best I could tell you the statement she made to me.

. . . . .

Q. Do you have any facts that George Norcross directed her to make that call?

A. No.

Q. Do you have any facts ... that any member of the [CCDC] directed Phyllis Pearl to make that call?

A. ... No.

*See id.* at 90–103. Willis further testified that Pearl met him at his office a short time after her telephone solicitation to see "if [Farris had] decided[ ] he would give the $3000 for support of Rob Andrews[.]" *Id.* at 106.

In addition, Farris testified that Mitchell stated that Norcross was behind the County's failure to pay his overdue rent. *See* Farris Dep. (Sept. 16, 1998) at 52–53. Specifically, Farris testified:

Q. [By Mr. Zarrillo] Did anyone tell you that Mr. Bezich was not signing your [rent] checks because of your failure to make political contributions?

A. Yes

Q. Who?

A. Tom Mitchell.

. . . . .

Q. Tell me the exact details of that conversation with Mr. Mitchell?

. . . . .

A. I said, "What does [Sasala] mean it's a political thing?" And [Mitchell] said to me, "Number 1, Lou Bezich doesn't have enough brains to not sign your check on his own, he got that from Mr. Norcross ... [M]aybe the next time they want you to give it might be easier to give."

. . .

Q. And he attributed the failure to make the check payment to Mr. Norcross?

A. Correct.

*See Id.* Farris also testified that Mitchell stated to him that Norcross had directed the County to renegotiate Farris's leases. *See* Farris Dep. (Aug. 12, 1998) at 332.

In their deposition testimony, Mitchell, Palombi, and Pearl each denied having made the statements Farris and Willis attribute to them. *See* § I *supra.* Norcross

testified at his deposition that he did not direct County officials to withhold Farris's rent payments, to renegotiate Farris's leases, or coerce Farris into making political contributions. *See* Norcross Dep. at 115–17, 121–22, 149–54, 155.

Before I can consider whether this conflicting deposition testimony constitutes a genuine disputed issue of material fact, sufficient to warrant the denial of Norcross's and the CCDC's motion for summary judgment, I must first determine whether the statements attributable to Palombi, Pearl, and Mitchell are admissible under the Federal Rules of Evidence. *Blackburn,* 179 F.3d at 95. Farris contends that these statements are admissible under Rule 801(d)(2)(E) of the Federal Rules of Evidence, as "statement[s] by a coconspirator of a party during the course and in furtherance of the conspiracy[.]" *See* Fed. R. Ev. 801(d)(2)(E).

Rule 801(d)(2)(E) provides, in relevant part:

A statement is not hearsay if ... [t]he statement is offered against a party and is ... (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy. The contents of the statement shall be considered but are not alone sufficient to establish ... the existence of the conspiracy and the participation therein of the declarant and the party against whom the statement is offered under subdivision (E).

*See* Fed. R. Ev. 801(d)(2)(E). The current rule is the result of an amendment in 1997 adopted to conform the rule to the United States Supreme Court's decision in *Bourjaily v. United States,* 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987). *See* Fed. R. Ev. 801, Advisory Committee Note to 1997 Amendment. The Advisory Committee Note to the 1997 Amendment states:

First, the amendment codifies the holding in *Bourjaily* by stating expressly that a court shall consider the contents of a coconspirator's statement in determining "the existence of the conspiracy and the participation therein of the declarant and the party against whom the statement is offered." According to *Bourjaily,* Rule 104(a) requires these preliminary questions to be established by a preponderance of the evidence. Second, the amendment resolves an issue on which the Court had reserved decision. It provides that the contents of the declarant's statement do not alone suffice to establish a conspiracy in which the declarant and the defendant participated. The court must consider in addition the circumstances surrounding the statement, such as the identity of the speaker, the context in which the statement was made, or evidence corroborating the contents of the statement in making its determination as to each preliminary question.

*See id.*

In *United States v. Ellis,* 156 F.3d 493 (3d Cir.1998), the Third Circuit discussed the requirements for satisfying Rule 801(d)(2)(E). *See id.* at 496. The Third Circuit held:

[Rule] 801(d)(2)(E) excepts from the definition of hearsay a statement by a coconspirator of a party during the course and in furtherance of the conspiracy. In order for an out-of-court statement to be admissible pursuant to Rule 801(d)(2)(E), the district court must find by a preponderance of the evidence that: (1) a conspiracy existed; (2) the declarant and the party against whom the statement is offered were members of the conspiracy; (3) the statement was made in the course of the conspiracy; and (4) the statement was made in furtherance of the conspiracy. Where the district court finds that a conspiracy existed, we review the district court's findings as to these elements for clear error.

*Id.* (citing *United States v. McGlory,* 968 F.2d 309, 333–34 (3d Cir.1992); *United States v. Cruz,* 910 F.2d 1072, 1081 n. 11 (3d Cir.1990)).

■ A District Court "must be able to find these requirements by a preponderance of the evidence." *McGlory*, 968 F.2d at 333 (citing *Bourjaily*, 483 U.S. at 175, 107 S.Ct. 2775); *see also United States v. Gambino*, 926 F.2d 1355, 1361 (3d Cir. 1991); *see* Fed. R. Ev. 801, Advisory Committee Note to 1997 Amendment. "Sufficient proof of the existence of the conspiracy and defendant's membership in it may include hearsay statements and other independent evidence." *See* 5 Jack B. Weinstein & Margaret A Berger, *Weinstein' Federal Evidence*, § 801.33[1] (Joseph M. McLaughlin, ed., Matthew Bender 2d ed.1997) (citations omitted).

As discussed in the Advisory Committee Note to the 1997 Amendment to Rule 801, the *Bourjaily* court held that preliminary questions regarding the admissibility of coconspirators' statements under Rule 801(d)(2)(E) are to be made by the Court pursuant to Rule 104(a) of the Federal Rules of Evidence. *Bourjaily*, 483 U.S. at 175, 107 S.Ct. 2775. The Supreme Court specifically held:

> Before admitting a co-conspirator's statement over an objection that it does not qualify under Rule 801(d)(2)(E), a court must be satisfied that the statement actually falls within the definition of the Rule. There must be evidence that there was a conspiracy involving the declarant and the nonoffering party, and that the statement was made "during the course and in furtherance of the conspiracy." Federal Rule of Evidence 104(a) provides: "Preliminary questions concerning ... the admissibility of evidence shall be determined by the court." Petitioner and the Government agree that the existence of a conspiracy and petitioner's involvement in it are preliminary questions of fact that, under Rule 104, must be resolved by the court.

*Id.* On the issue of the Court's preliminary determination, Judge Weinstein's often-cited treatise provides: "In determining whether the proponent of the co-conspirator statements has made a sufficient show-

ing to satisfy the preponderance of the evidence standard, the trial court must weigh the credibility and reliability of the evidence, including the hearsay statements themselves." *See 1 Weinstein's Federal Evidence*, § 104.16[4][b] (citing *Precision Piping & Instruments, Inc. v. E.I. du Pont de Nemours & Co.*, 951 F.2d 613, 621 (4th Cir.1991); *Earle v. Benoit*, 850 F.2d 836, 842 (1st Cir.1988)).

■ Because the declarants of the hearsay statements, Mitchell, Palombi, and Pearl, deny that they made the statements attributed to them, this case presents an interesting issue of law involving the interaction of Rules 104(a) and 801(d)(2)(E). The only evidence Farris has produced in opposition to Norcross's and the CCDC's motion for summary judgment on his substantive claims for tortious interference, are the hearsay statements of Mitchell, Pearl, and Palombi, which he claims are admissible under the coconspirator exception of Rule 801(d)(2)(E). As the rule and the case law require, to admit these statements into evidence, Farris must first prove by a preponderance of the evidence that a conspiracy existed and that the declarant and the party against whom the statements are to be used were members of the conspiracy. In this case, however, Mitchell, Pearl, and Palombi, deny making the statements attributed to them by Farris and Willis. In addition, as a matter of state law, Mitchell cannot conspire with Norcross or the CCDC to interfere with the County's contractual and prospective contractual relationships with Farris. *See* § IV.A.3.b *infra*. This evidentiary question is further complicated because the alleged "conspiracy" is a civil conspiracy, which under New Jersey law is not an independent cause of action, but rather a "liability expanding mechanism" which exists only if Farris can prove the underlying "independent wrong," here, tortious interference. *Eli Lilly and Co.*, 23 F.Supp.2d at 497; *see* § IV.A.1.b *supra*.

Thus, because I must determine the admissibility of the statements before reach-

ing the issue of whether Farris has presented enough evidence to avoid summary judgment, *Blackburn,* 179 F.3d at 95, I must find that Farris has proved by a preponderance of the evidence that a civil conspiracy, involving Norcross or the CCDC, to tortiously interfere with his leases with the County existed, recognizing that proof of such a conspiracy is dependent upon whether one of the alleged conspirators did actually interfere with Farris's leases. *See Eli Lilly and Co.,* 23 F.Supp.2d at 497. Curiously, this requires that I determine whether Farris can ultimately prove his case against Norcross and the CCDC before determining whether Farris is entitled to present this same case to a jury.

■ After reviewing the evidence in the summary judgment record, I conclude that I cannot determine whether Farris has proven by a preponderance of the evidence the existence of a civil conspiracy involving Norcross or the CCDC, Pearl and Palombi. Although I am not bound by the rules of evidence in making an admissibility determination under Rule 104(a), *see* Fed. R. Ev. 104(a), and may consider Mitchell's hearsay statements as evidence *aliunde, i.e.,* in addition to the statements of Pearl and Palombi, I conclude that, given that the declarants have denied making the statements at issue, I must take testimony at a Rule 104 hearing to assess the credibility of Farris, Willis, Mitchell, Palombi

and Pearl. *See Earle v. Benoit,* 850 F.2d 836, 841–43 (1st Cir.1988); *James R. Snyder Co., Inc. v. Assoc. General Contractors of America,* 677 F.2d 1111, 1117–18 (6th Cir.1982). Only after I have had the opportunity to assess the credibility of these witnesses will I be able to determine the admissibility of the hearsay statements of Palombi and Pearl, and thus be able to consider Norcross's and the CCDC's motion for summary judgment on Counts IX and X of the Complaint.

■ Farris contends that the testimony of Joseph F. Carroll, a former Camden County Freeholder from January 1, 1983, through December 31, 1990, and William R. Bostic, Esq., Adjuster for the County of Camden from April, 1984, through December, 1993, *see* Certification of Joseph F. Carroll (dated Jan. 11, 1999); Deposition of Joseph F. Carroll (dated Oct. 1, 1998); *see also* Certification of William R. Bostic, Esq. (dated Jan. 6, 1999), that Norcross and the CCDC have in the past exerted pressure to the point of coercing County employees and persons doing business with the County to make and solicit political contributions, is sufficient independent evidence to support a finding by the Court that a conspiracy involving Norcross or the CCDC to tortiously interfere with Farris's leases existed.[9] *See* Plaintiff's Brief in Opposition to Norcross's and the CCDC's Motion for Summary Judgment (filed Feb. 5, 1999) at 34–36. First, while I may

9. Farris also contends that the testimony of Carroll and Bostic is admissible under Rules 404(b) and 406 of the Federal Rules of Evidence. *See* Farris's Brief in Opposition to Norcross's and the CCDC's Motion for Summary Judgment (filed Feb. 5, 1999) at 34–36. I note that this contention, like the evidence it champions, is particularly weak. Farris seeks to have this Court accept Carroll's and Bostic's testimony that Norcross has exerted substantial pressure over County employees in the past as evidence that he has a habit of tortiously interfering with the County's contracts, akin to "semi-automatic" acts like "going down a particular stairway two stairs at a time, or of giving the hand-signal for a left turn[.]" *See* Fed. R. Ev. 406, Advisory Committee Note. Such a contention borders on the

frivolous. Similarly, this evidence does not fit within the Rule 404(b) "other acts" exception to the general rule that, in civil cases, character evidence "is not admissible for the purpose of proving action in conformity therewith on a particular occasion[.]" *See* Fed. R. Ev. 404(a); *see also Rocky Mountain Helicopters, Inc. v. Bell Helicopters Textron,* 805 F.2d 907, 917 (10th Cir.1986); *Crowley v. Cooperstein,* 1996 WL 524101, at *2 (E.D.Pa. Sept.11, 1996); *Fryou v. Gaspard,* 1991 WL 68440, at *1 (E.D.La. Apr.25, 1991). It is clear that Farris seeks to use the testimony of Carroll and Bostic about Norcross's past conduct to prove that Norcross acted in the same way with Farris. This is inadmissible "propensity" evidence.

consider this evidence in making my Rule 104 admissibility determination, the testimony of Carroll and Bostic is of dubious relevance to this case, given that both have testified that they have no knowledge of the events forming the basis of this lawsuit. *See* Bostic Cert., ¶ 18; Carroll Cert., ¶ 24. Second, the testimony of Carroll and Bostic is disputed. Norcross disputes Carroll's and Bostic's characterization of his influence over the affairs of Camden County. *See* Norcross Dep. at 147 ("I . . . read [Bostic's] certification, and he is a liar, and it is false."); *see id.* at 123–27. And the very people from whom Bostic claims to have solicited political contributions, testified that they were in no way coerced or compelled to make contributions to the CCDC, or Norcross. *See* Reply Brief in Support of Motion of Norcross and the CCDC for Sanctions (filed Jan. 22, 1999), Exh. Exh. D (Certifications of Frank A. Desmoni, Neal A. Loebel, Jack N. Hill, Gerald P. Burke, Robert Ellis, Robert Durand, Mary Dugdale, Arnold Sussman).

Therefore, because the determination of whether Farris has proven the existence of a civil conspiracy by a preponderance of the evidence depends on an evaluation of the credibility of Farris and the declarants, Mitchell, Palombi, and Pearl, I shall conduct a Rule 104 hearing to take testimony and other evidence to determine the preliminary factual questions surrounding the admissibility of Palombi's and Pearl's alleged statements. *Blackburn,* 179 F.3d at 95; *see also Earle,* 850 F.2d at 841–43. Accordingly, at this time, I shall deny the

motion of Norcross and the CCDC for summary judgment on Counts IX and X of the Complaint, without prejudice to their right to renew the motion at the conclusion of the Rule 104 hearing.[10]

### b. *Counts XII and XIV, Conspiracy to Tortiously Interfere*

■ In Count XII of the Complaint, Farris alleges that Norcross and the CCDC conspired with Bezich, Mitchell, and Palombi to tortiously interfere with Farris's leases with the County.[11] *See* Compl., Count XII. Similarly, in Count XIV of the Complaint, Farris alleges that Norcross and the CCDC conspired with Pearl to tortiously interfere with Farris's leases. *See id.,* Count XIV. Considering Norcross's position as Chairman of the CCDC, and the CCDC's status as a legal entity, I conclude as a matter of law that, just as an authorized agent of a corporation cannot conspire with the corporation as an entity, Norcross cannot conspire with the CCDC. This conclusion, however, does not entitle Norcross and the CCDC to summary judgment on Counts XII and XIV.

In the Complaint, Farris alleges that the CCDC is a corporation organized under the laws of the State of New Jersey, and that Norcross, "at all times relevant to this Complaint, was Chairman" of the CCDC. *See* Compl., ¶ 8. In New Jersey, it is well settled that "a corporation which acts through authorized agents and employees . . . cannot conspire with itself." *Tynan v. General Motors Corp.,* 248 N.J.Super. 654,

---

10. Because I have denied the motion of Norcross and the CCDC for summary judgment without prejudice to their right to renew the motion upon conclusion of the Rule 104 hearing, I need not consider Farris's Rule 56(f) application to continue the motion until the completion of discovery. I note that pre-trial factual discovery closed in this case on February 28, 1999, and that Farris shall have ample opportunity to defend against Norcross's and the CCDC's renewed motion for summary judgment, should any be filed. Accordingly, I shall dismiss the Rule 56(f) application as moot.

11. To the extent that Count XII seeks to allege a claim for civil conspiracy to defraud against Norcross and the CCDC, *see* § IV.A.3.c *infra,* the motion for summary judgment shall be denied for the reasons set forth in § IV.A.1.a *supra.* Unlike Farris's claims for tortious interference and civil conspiracy to tortiously interfere, Mitchell, as a matter of New Jersey law, is not precluded from conspiring to defraud. *See* § IV.A.3.c *infra.* Thus, if admissible, *see* § IV.A.1.a, these statements may be considered as admissions attributable to Norcross or the CCDC. *See* Fed. R. Ev. 801(d)(2)(E).

668, 591 A.2d 1024 (App.Div.1991), *rev'd in part on other grounds,* 127 N.J. 269, 604 A.2d 99 (1992) (citing *Exxon Corp. v. Wagner,* 154 N.J.Super. 538, 545, 382 A.2d 45 (App.Div.1977)). Thus, under the rule of *Tynan* and *Exxon Corp.,* it would seem clear that Norcross as the Chairman of the CCDC could not conspire with the CCDC to achieve common unlawful objectives, namely, the extortion of political contributions and the interference with Farris's real property.

Farris's allegation of the CCDC's legal status, however, is inaccurate. *See* Answer of the CCDC and Norcross (filed Feb. 6, 1998). The CCDC is not a corporation, but rather a county political committee organized under N.J. Stat. Ann. § 19:5–3 (West 1999).[12] *See* Answer of the CCDC and Norcross (filed Feb. 6, 1998). After reviewing the rationale supporting the rule enunciated in *Tynan* and *Exxon*

*Corp.,* I conclude that there is no basis to distinguish a county political committee from a corporation in this context.

A private corporation, incorporated under the New Jersey Business Corporation Act ("NJBCA"), N.J. Stat. Ann. § 14A:1–1 *et seq.,* is a legal fiction, governed by a board of directors elected by its shareholders, and which may only act through its employees or authorized agents. *See* N.J. Stat. Ann. §§ 14A:3–1 *et seq.;* 14A:7–1 *et seq.* Similarly, a county political committee, organized under the N.J. Stat. Ann. § 19:5–3, is a legal entity, governed by officers elected by members of the party, which also may only act through its officers, employees and authorized agents. Thus, both a corporation and a county political committee may only act through natural persons authorized to do so. It is clear that a director or officer of a private corporation cannot conspire to achieve an

---

**12.** Section 19:5–3 provides, in relevant part:

The members of the county committees of political parties shall be elected annually at the primary for the general election in the manner provided in this Title for the selection of party candidates to be voted for at the general election by voters of a municipality ... Members of the county committee shall actually reside in the districts or units which they respectively represent. The county committee shall determine by its bylaws the units into which the county shall be divided for purpose of representation in the county committee. The members of the county committee of each of the political parties shall take office on the first Saturday following their election, on which day the terms of all members of such committees theretofore elected shall terminate. The annual meeting of each county committee shall be held on the first Tuesday following the primary election, except that when such meeting day falls on a legal holiday then the said meeting shall be held on the day following, and when such meeting day falls on the day of a municipal runoff election within the county then said meeting may be held on the day following, at an hour and place to be designated in a notice in writing to be mailed by the chairman of the outgoing county committee to each member-elect, at which annual meeting the members of such committee shall elect some suitable person as chairman who

shall be a resident of such county to hold office for 1 year, or until his successor is elected. The members shall also elect a vice-chairman of the opposite sex of the chairman to hold office for 1 year or until his or her successor is elected and the vice-chairman shall perform all duties required of him or her by law and the constitution and bylaws of such committee. Such committee shall have power to adopt a constitution and bylaws for its proper government. The chairman shall preside at all meetings of the committee and shall perform all duties required of him by law and the constitution and bylaws of such committee. When a member of a county committee ceases to be a resident of the district or unit from which elected, a vacancy on the county committee shall exist. A member of a county committee of any political party may resign his office to the committee of which he is a member, and upon acceptance thereof by the committee a vacancy shall exist. A vacancy in the office of a member of the county committee of any political party, caused by death, resignation, failure to elect or otherwise, shall be filled for the unexpired term by the municipal committee of the municipality wherein the vacancy occurs, if there is such committee, and if not, by the remaining members of the county committee of such political party representing the territory in the county in which such vacancy occurs.
*See* N.J. Stat. Ann. § 19:5–3.

unlawful purpose with the fictitious entity that is the corporation because a corporation "cannot conspire with itself." *Tynan*, 248 N.J.Super. at 668, 591 A.2d 1024. Equally so, an officer of a county political committee, like Norcross, cannot conspire with the CCDC, as an entity, to tortiously interfere with Farris's contractual relationships because, essentially, the CCDC would be conspiring with itself.

Applying the rule of *Tynan* and *Exxon Corp.* to county political committees, organized pursuant to N.J. Stat. Ann. § 19:5–3, however, does not entitle Norcross and the CCDC to summary judgment on Counts IX and X of the Complaint. Construing the allegations in the Complaint in the light most favorable to Farris, *cf. Abraham*, 183 F.3d 279, I shall consider Farris's claims for civil conspiracy to tortiously interfere, Counts XII and XIV, as alleging two separate conspiracies: one involving Norcross and the other named coconspirators, not including the CCDC; and the other involving the CCDC and the other named coconspirators, not including Norcross.

In *Eli Lilly and Co. v. Roussel Corp.*, 23 F.Supp.2d 460 (D.N.J.1998), Judge Greenaway discussed the essential elements of a claim for civil conspiracy under New Jersey law. *See id.* at 496–97. Judge Greenaway wrote:

> In New Jersey, the essential elements of a civil conspiracy are: (1)[a] combination of two or more persons; (2) a real agreement or confederation with a common design; (3) the existence of an unlawful purpose to be achieved by unlawful means; and (4) special damages. However, a plaintiff need not prove that the unlawful agreement was express or that each participant in the conspiracy knew the exact limits of the illegal plan or the identity of all participants, as long as plaintiff alleges that each participant shared in the general conspiratorial objective. The plaintiff need not provide direct evidence of the agreement between the conspirators; it is enough that

it could be circumstantially inferred from the facts that the conspirators had reached an understanding.

> A civil action for conspiracy is essentially a tort action. Therefore, to maintain an action for civil conspiracy, a plaintiff must also point to (1) an overt act of one or more of the conspirators in furtherance of the conspiracy; and (2) consequential damage to the rights of another, of which the overt act is the proximate cause. Plaintiff cannot bring an action alleging civil conspiracy unless defendants committed an act which would be actionable even without the conspiracy. Thus, the conspiracy is not the gravamen of the charge, but merely a matter of aggravation, enabling the plaintiff to recover against all the defendants as joint tortfeasors. The actionable element is the tort which the defendants agreed to perpetrate and which they actually committed ... A conspiracy is not actionable absent an independent wrong[.]

*Id.* (citations, internal quotations and footnote omitted); *see also Morgan v. Union County Bd. of Chosen Freeholders*, 268 N.J.Super. 337, 365, 633 A.2d 985(App.Div.1993); *Tynan*, 248 N.J.Super. at 654, 591 A.2d 1024.

Because Farris's claims for civil conspiracy to tortiously interfere are dependent upon the viability of Farris's substantive claims for tortious interference against Norcross and the CCDC, set forth in Counts IX and X of the Complaint, for the reasons discussed above in section IV. A.1.a, I shall deny Norcross's and the CCDC's motion for summary judgment on Counts XII and XIV of the Complaint, without prejudice to their right to renew this motion at the conclusion of the Rule 104 hearing.

c. *Count XIII, Conspiracy to Defraud*

In Count XIII of the Complaint, Farris alleges that Camden County conspired with Norcross and the CCDC to "coerce and defraud Plaintiff into entering into [the renegotiated leases]." *See* Compl.,

¶ 161. In support of their motion for summary judgment, Norcross and the CCDC contend that Farris has failed to allege an independent actionable wrong committed by Norcross or the CCDC which would support his claim for civil conspiracy. I agree.

For the reasons set forth in section IV.A.2.f *infra*, the County, as a matter of law, cannot form the requisite intent to defraud. Thus, for Farris's claim for civil conspiracy to survive, Farris must allege some wrongdoing on the part of Norcross or the CCDC amounting to common law fraud. Farris, however, has made no allegation that Norcross or the CCDC attempted to, or succeeded in defrauding him by inducing him to accept the reduced rental rate, or the thirty-day termination clause. *See* Compl. In Count XIII, Farris merely alleges that the County, through its employees and agents, "conspired with Defendants Norcross and the [CCDC] ..." *See* Compl., ¶ 160. Farris does not allege that Norcross or the CCDC "committed an act which would be actionable even without the conspiracy." *Eli Lilly and Co.*, 23 F.Supp.2d at 497. Accordingly, because Farris has failed to allege "an independent wrong" attributable to Norcross and the CCDC amounting to common law fraud, *id.*, I conclude that Norcross and the CCDC are entitled to summary judgment on Count XIII of the Complaint.

d. *Counts XV, XVI, XVII, XVIII, and XIX Conspiracy to Extort, Blackmail and Deprive Farris of his Real Property*

In Counts XV, XVI, XVII, XVIII, and XIX of the Complaint, Farris alleges that Norcross and the CCDC conspired with other defendants to extort political contributions from Farris, and that these defendants conspired to deprive Farris of his real property. *See* Compl., Counts XV, XVI and XVIII. For the reasons set forth in section IV.A.2.j *infra*, I shall grant Norcross's and the CCDC's motion for summary judgment on Counts XV, XVI, XVII, XVIII, and XIX of the Complaint because Farris has failed to allege an actionable independent wrong. *See Eli Lilly and Co.*, 23 F.Supp.2d at 497.

e. *The Motion for Sanctions Pursuant to 28 U.S.C. § 1927 and the Court's Inherent Power*

William M. Tambussi, Esq., counsel for Defendants, Norcross and the CCDC, has moved for sanctions in the form of attorneys' fees and costs against Jerald R. Cureton, Esq., Darryl S. Caplan, Esq., and Anthony Valenti, Esq., counsel for Farris, pursuant to 28 U.S.C. § 1927 and the Court's inherent powers.[13] *See* Notice of Motion (filed Dec. 8, 1998).[14] Specifically, these Defendants contend that Plaintiff's counsel asserted claims against them which counsel knew or should have known lacked an arguable basis in law and fact. Curiously, Norcross and the CCDC do not bring their motion for the imposition of sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure. *See* Letter to the Court from William M. Tambussi, Esq. (dated Jan. 11, 1999). Yet, Norcross and the CCDC do request that the Court *sua sponte* sanction counsel for Farris pursuant to Rule 11(c)(1)(B). *See id.*

In their motion for sanctions and attorneys' fees, counsel for Norcross and the

---

13. Section 1927 provides:

Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.
*See* 28 U.S.C. § 1927.

14. Neither the Notice of Motion, or the Form of Order submitted by Mr. Tambussi specifically state against whom Mr. Tambussi is seeking sanctions. *See* Notice of Motion (filed Dec. 8, 1998); Form of Order (submitted Dec. 8, 1998). Review of the brief in support of the motion, however, makes it abundantly clear that the motion for sanctions is directed against counsel for Farris. *See* Brief in Support of Motion for Sanctions (filed Dec. 8, 1998).

CCDC contend that counsel for Farris have "intentionally advance[d] ... baseless contention[s] ... for an ulterior purpose, such as harassment or delay[.]" *See* Brief in Support of Motion for Sanctions (filed Dec. 8, 1998) at 17 (citing *Ford v. Temple Hosp.*, 790 F.2d 342, 347 (3d Cir.1986)). Specifically, Norcross and the CCDC contend that they put counsel for Farris on notice of the baselessness of Farris's claims as early as November, 1997, and notified counsel for Farris of their intention to seek sanctions in February, 1998.[15] *See id.* at 6. Norcross and the CCDC further contend that counsel for Farris misrepresented the knowledge of Sasala, Maguire, and Joseph Carroll, a former Camden County Freeholder, in their Rule 26 Initial Disclosures, and that the baselessness of Farris's factual allegations was borne out time and again during the course of discovery. *See id.* at 5–13, 17–18.

In opposing the motion for sanctions and attorneys' fees, counsel for Farris contend that "[t]he timing of Defendants' motion and the predicates upon which it is based discloses [sic] Defendants' real purpose, an attempt to intimidate Plaintiff into withdrawing his claims and preventing Plaintiff from obtaining the discovery he has sought." *See* Plaintiff's Brief in Opposi-

tion to Motion for Sanctions (Jan. 20, 1999) at 20. Counsel for Farris further contends that any finding of bad faith by the Court should be directed at counsel for Norcross and the CCDC because:

> Defendants' ... pursuit of this motion is ... a transparent attempt to avoid the procedural provisions of Fed.R.Civ.P. 11. Indeed, Defendants failed to comply with the procedural requirements of Rule 11 by filing their original motion directly with the Court. The motion was picked up by [a local newspaper] which ran an article in January[, 1999,] in which Defendants' counsel trumpet [the] motion for sanctions in an attempt to embarrass and humiliate Plaintiff and his counsel.

*Id.* at 21.

The acrimony between counsel continued even after the motion for sanctions and attorneys' fees was filed on December 8, 1998. On December 17, 1998, Mr. Tambussi, counsel for Norcross and the CCDC, sent a letter to Mr. Valenti, counsel for Farris, hand delivering a copy to the Court. *See* Letter from Mr. Tambussi to Mr. Valenti (dated Dec. 17, 1998). The purpose of the letter was to inform Mr. Valenti that Norcross and the CCDC

---

15. Recently, in *Slater v. Skyhawk Transp., Inc.*, 187 F.R.D. 185, 200 (D.N.J.1999), I discussed the type of notice required by Rule 11 of the Federal Rules of Civil Procedure. I wrote:

> Rule 11, however, creates a "safe harbor" that requires a party moving for sanctions to offer the opposing party a chance to withdraw "the challenged paper, claim, defense, contention, allegation, or denial." Fed.R.Civ.P. 11(c)(1)(A); *see also Hockley v. Shan Enters. Ltd. Partnership*, 19 F.Supp.2d 235, 240 (D.N.J.1998) (Brotman, J.) ("The 'safe harbor' provision requires the party moving for sanctions to notify the party against which it seeks sanctions of its intention to move for sanctions"). "The express purpose of this amendment to the rule was to prevent abuses of Rule 11 sanctions by providing parties a 'safe harbor' within which they will not be subject to sanctions unless they refuse to withdraw offending papers filed with the court." *Hockley*, 19

F.Supp.2d at 240. "To stress the seriousness of a motion for sanctions and to define precisely the conduct claimed to violate the rule, the revision provides that the 'safe harbor' period begins to run only upon receipt of the motion." Fed.R.Civ.P. 11 advisory committee's note to 1993 Amendment; *see also Piantone v. Sweeney*, No. Civ. A. 94–7007, 1995 WL 691915, at *1 n. 1 (E.D.Pa. Nov.21, 1995). As a result, "[a]n informal notice, either by letter or other means, does not trigger the commencement of the 21 day period." *Piantone*, 1995 WL 691915, at *1 n. 1. "In most cases, however, counsel should be expected to give informal notice to the other party, whether in person or by a telephone call or letter, of a potential violation before proceeding to prepare and serve a Rule 11 motion." Fed.R.Civ.P. 11, advisory committee's notes to 1993 Amendment.

*Id.*

would not consent to an extension of time for counsel for Farris to oppose the motion for sanctions. *See id.* Before delivering this simple message, Mr. Tambussi wrote:

> As your office is well aware, numerous requests have been made dating back to November 1997 that the claims against Mr. Norcross and the Democrat [sic] Committee be dismissed in their entirety with prejudice and without condition. Significantly, when I met with Mr. Cureton, Mr. Caplan and you in your office on September 18, 1998, we discussed the factual basis of the claims (or lack thereof) and I specifically requested a dismissal with prejudice and without condition of the claims prior to the scheduled depositions of Teresa Kirby, William Maguire, Joseph Carroll and Stephen Sasala. Your office refused to provide such a dismissal with prejudice and without condition. Only after the time, effort and expenses were incurred to continue discovery, complete depositions and conduct further investigation confirming that your office knew there was no factual basis for the claims prior to filing and serving plaintiff's Initial Disclosures and Civil RICO Case Statement did your office offer to dismiss the claims against Mr. Norcross and the Democrat [sic] Committee, but on the condition that all claims for fees, costs and sanctions against plaintiff and your firm be released and discharged. The offer of dismissal subject to the conditions was declined.

*Id.*

As a result of Mr. Tambussi's December 17, 1998, letter, the Court received a plaintive missal from Mr. Valenti, requesting an adjournment of the return date of the motion. *See* Letter to the Court from Mr. Valenti (dated Dec. 18, 1998). In his letter, Mr. Valenti complained:

> [I]t is this firm's position that the motion filed by Mr. Tambussi is without merit and has been filed for an improper purpose. The motion includes a request for relief pursuant to Fed.R.Civ.P. 11 and it is this firm's contention that Mr. Tambussi utterly failed to comply with the "safe harbor" provisions of that rule. Further it is our position that the motion has been filed for the improper purpose of intimidating Plaintiff and as an attempt to force Plaintiff's counsel to reveal attorney-client privileges and work-product during the course of an ongoing litigation.

*Id.* I subsequently granted the requested extension, and adjourned the return date of the motion until January 29, 1999. *See* Letter of the Court to all Counsel of Record (dated Dec. 18, 1998).

Much to the Court's dismay, the "informal letter briefing" did not end with Mr. Valenti's letter of December 18, 1998. On January 11, 1999, although the opposing papers of counsel for Farris were not due until January 15, 1999, *see* L. Civ. R. 7.1, I received a letter from Mr. Tambussi informing me that "no opposition to the motion [for sanctions] ha[d] been received." *See* Letter to the Court from Mr. Tambussi (dated Jan. 11, 1999). Mr. Tambussi further wrote:

> [D]efendants respectfully advise the Court that the Fed.R.Civ.P. 11 request for sanctions is withdrawn without prejudice. Defendants do not withdraw the request for relief made pursuant to 28 U.S.C. § 1927 and the inherent power of the Court. Defendants respectfully submit that the Court has the authority pursuant to Fed.R.Civ.P. 11(c)(1)(B) to address the specific conduct of plaintiff and plaintiff's counsel as set forth in the record provided to the Court and therefore obviate any protestations by plaintiff's counsel that adequate notice has not been provided and service was somehow defective under the circumstances.

*Id.*[16]

Against this backdrop of trench warfare, I must consider Mr. Tambussi's motion for

---

**16.** Rule 11(c) of the Federal Rules of Civil Procedure provides, in relevant part:

sanctions. "Before a court can order the imposition of attorneys' fees under § 1927, it must find wilful bad faith on the part of the offending attorney." *Thomason v. Norman E. Lehrer, P.C.*, 182 F.R.D. 121, 132 (D.N.J.1998) (quoting *Williams v. Giant Eagle Markets, Inc.*, 883 F.2d 1184, 1191 (3d Cir.1989)). "Sanctions under section 1927 should only be imposed 'in instances of a serious and studied disregard for the orderly process of justice.'" *Thomason*, 182 F.R.D. at 132 (quoting *Williams*, 883 F.2d at 1191).

Similarly, before a court can impose the sanction of attorneys' fees against an opposing attorney, pursuant to the Court's inherent powers, the Court must find that opposing counsel "acted in bad faith." *Angelico v. Lehigh Valley Hosp.*, 184 F.3d 268, 279 (3d Cir.1999) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991)). In addition, before the Court may resort to exercising its inherent power to sanction an offending attorney or party for bad faith conduct, the Court must first must look to the Federal Rules of Civil Procedure and applicable statutes to "ensure that the sanction is tailored to address the harm identified." *Klein v. Stahl GMBH & Co.*, 185 F.3d 98, 111 (3d Cir.1999) (quoting *Republic of the Philippines v. Westinghouse Elec. Corp.*, 43 F.3d 65, 73 (3d Cir.1994)).

◼ The crux of Mr. Tambussi's motion for sanctions is that the allegations against Defendants, Norcross and the CCDC, contained in the Complaint lack evidentiary support, even after conducting significant discovery. *See* Brief in Support of Motion for Sanctions at 17–18. Although this contention may state a colorable claim for violation of Rule 11(b) of the Federal Rules of Civil Procedure, Mr. Tambussi has specifically stated that the motion for sanctions is brought under § 1927, and not Rule 11. *See* Letter to the Court from Mr. Tambussi (dated Jan. 11, 1999). I decline Mr. Tambussi's invitation to sanction counsel for Farris *"sua sponte,"* pursuant to Rule 11(c)(1)(B). *See id.* To do so would allow Mr. Tambussi to circumvent the "safe harbor" requirement of the Rule. *See* Fed.R.Civ.P. 11(c); *See Barber v. Miller*, 146 F.3d 707 (9th Cir.1998) (holding that defendant's failure to comply with Rule 11's "safe harbor" provision barred award of sanctions); *Elliott v. Tilton*, 64 F.3d 213, 216 (5th Cir.1995) (same); *Hadges v. Yonkers Racing Corp.*, 48 F.3d 1320, 1328 (2d Cir.1995) (same).

◼ While Farris has surely pleaded his claims against Norcross and the CCDC in a fractured and confusing manner, *see* Compl.; *see also* § IV.A.1.a-d *supra,* the allegations of the Complaint do not constitute a "'serious and studied disregard for the orderly process of justice.'" *Thomason*, 182 F.R.D. at 132 (quoting *Williams*, 883 F.2d at 1191). In addition, as the Court has previously discussed, whether

---

(c) Sanctions. If, after notice and a reasonable opportunity to respond, the court determines that subdivision (b) has been violated, the court may, subject to the conditions stated below, impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subdivision (b) or are responsible for the violation. (1) How Initiated. (A) By Motion. A motion for sanctions under this rule shall be made separately from other motions or requests and shall describe the specific conduct alleged to violate subdivision (b). It shall be served as provided in Rule 5, but shall not be filed with or presented to the court unless, within 21 days after service of the motion (or such other period as the court may prescribe), the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn or appropriately corrected. If warranted, the court may award to the party prevailing on the motion the reasonable expenses and attorney's fees incurred in presenting or opposing the motion. Absent exceptional circumstances, a law firm shall be held jointly responsible for violations committed by its partners, associates, and employees. (B) On Court's Initiative. On its own initiative, the court may enter an order describing the specific conduct that appears to violate subdivision (b) and directing an attorney, law firm, or party to show cause why it has not violated subdivision (b) with respect thereto. *See* Fed.R.Civ.P. 11(c).

Farris has produced admissible evidence in support of his claims against Norcross and the CCDC depends upon the complicated application of the Federal Rules of Evidence, which will turn on the credibility of the witnesses. *See* § II.A.1.a *supra.* While Farris and his counsel have certainly failed to produce an overwhelming body of evidence to support their claims against Norcross and the CCDC, an examination of the factual record in this case does not warrant the conclusion that counsel for Farris "intentionally advance[d] . . . baseless contention[s] . . . for an ulterior purpose, such as harassment or delay[.]" *Ford v. Temple Hosp.*, 790 F.2d at 347; *see also Ellison v. Shenango Inc. Pension Bd.*, 956 F.2d 1268, 1276 (3d. Cir.1992). To be sure, the inartful and confusing pleading of Farris's claims will not win any prizes for legal advocacy. Moreover, the "checkered" pedigree of Farris's evidence may ultimately require this Court to grant Norcross and the CCDC summary judgment; but Farris's claims advanced by his counsel do not constitute bad faith, within the meaning of § 1927.

Accordingly, because I find that counsel for Norcross and the CCDC have failed to demonstrate that Farris's attorneys acted in bad faith, the motion for sanctions, attorneys' fees and costs, pursuant to 28 U.S.C. § 1927, shall be denied. Similarly, the finding of a lack of bad faith by Farris's counsel precludes this Court from considering whether counsel for Farris should be sanctioned pursuant to the Court's inherent powers, *Klein,* 185 F.3d at 111; *Angelico,* 184 F.3d at 279. Accordingly, I shall deny the motion for sanctions brought pursuant to this Court's inherent powers.

### 2. *Camden County's Motion for Summary Judgment*

Camden County contends that it is entitled to "summary judgment dismissing all claims against it." *See* Notice of Motion (Apr. 3, 1999). Farris has alleged eleven causes of action against Camden County, specifically: (1) Count I, rescission or reformation of the renegotiated leases on the basis of economic duress; (2) Count II, rescission or reformation of the renegotiated leases on the basis of fraud and fraudulent misrepresentation; (3) Count III, rescission or reformation of the renegotiated leases on the basis of unconscionability; (4) Counts IV and V, breach of the original leases; (5) Count VI, common law fraud; (6) Count VII, breach of contract and conversion arising out of the assignment of rents to Commerce Bank; (7) Count XI, breach of the duty of good faith and fair dealing; (8) Count XIII, civil conspiracy to defraud Plaintiff; (9) Count XVII, civil conspiracy to extort political contributions from Plaintiff; and (10) Count XIX, civil conspiracy to deprive Plaintiff of his real property. *See* Compl. In resolving the County's motion for summary judgment, I will consider these claims in *seriatim.*

### a. *Count I, Rescission or Reformation on the basis of Economic Duress*

In Count I of the Complaint, Farris alleges that Camden County engaged in "coercive and oppressive tactics" in renegotiating the leases "as to cause Plaintiff to do what his free will would have otherwise refused and enter into the renegotiated [leases]." *See* Compl., ¶¶ 77, 79. Farris alleges that Camden County's coercive and oppressive tactics included: (1) withholding rent due under the original leases; (2) requiring Farris to accept a reduced rental rate and a thirty-day termination provision in the renegotiated leases as a condition of receiving rent due under the original leases; and (3) threatening, during renegotiations, to vacate the 1300 Building immediately and to relocate its operations to the RCA building, even though the County knew that the RCA building could not accommodate the County in April, 1992. *See* Compl., ¶¶ 42–53.

Farris further alleges that, because he entered into the renegotiated leases under duress, he is entitled to rescission or reformation of the leases, receiving as damages "the difference between what [he] received pursuant to the renegotiated 1300 Building

lease and that which [he] would have received for the remaining term of the original 1300 Building [l]eases, plus what plaintiff would have received for the remaining term of the [r]enegotiated [l]ease under lease terms that were the same as the original 1300 Building [L]eases." *See* Compl., ¶ 83. In addition, Farris claims that he "is entitled to the difference between what [he] received pursuant to the [renegotiated] 1350 Building [l]ease ... and the fair rental value [of the property]." *Id.*, ¶ 82.

In support of its motion for summary judgment, Camden County contends that the evidence in the summary judgment record demonstrates that Farris cannot establish that he was acting under economic duress at the time he entered into the renegotiated leases. *See* County of Camden's Brief in Support of Motion for Summary Judgment (filed Apr. 30, 1999), at 16–18 ("County's Brief"). The County further contends that Farris's claims for rescission and reformation of the renegotiated leases, and for breach of the original leases are barred by the doctrines of waiver and equitable estoppel. *See id.* at 18–20.

■ Rescission and reformation are equitable remedies designed "to restore the parties to the *status quo ante* and prevent the party who is responsible for the [wrongdoing] from gaining a benefit." *Bonnco Petrol, Inc. v. Epstein,* 115 N.J. 599, 612, 560 A.2d 655 (1989) (citing *Enright v. Lubow,* 202 N.J.Super. 58, 72, 493 A.2d 1288 (App.Div.1985)). "To qualify for the equitable relief sought, the party must show special circumstances justifying a departure from the generally controlling principle that parties are bound by the contracts they make for themselves." *Intertech Assocs., Inc. v. City of Paterson,* 255 N.J.Super. 52, 59–60, 604 A.2d 628 (App.Div.1992) (citations and internal alterations omitted). "Ordinarily, contracts may only be rescinded [or reformed] where there is original invalidity, fraud, failure of consideration or a material

breach." *Notch View Assocs., A.D.S. v. Smith,* 260 N.J.Super. 190, 197, 615 A.2d 676 (Law Div.1992) (citations omitted); *see Bonnco Petrol,* 115 N.J. at 611, 560 A.2d 655.(stating that a court must choose between rescission and reformation). "[E]ven where the grounds for rescission [or reformation] exist, the remedy is discretionary and will not be granted where the claimant has not acted within a reasonable time or where there has been substantial performance." *Notch View Assocs.,* 260 N.J.Super. at 198, 615 A.2d 676 (citations omitted).

■ "Although ... not an absolute requirement," *Id.* at 198, 615 A.2d 676, "the court must be able to return the parties to their original position." *Id.* at 197, 615 A.2d 676. A plaintiff seeking rescission or reformation must prove by clear and convincing evidence his right to the equitable remedy. *See Esoldi v. Esoldi,* 930 F.Supp. 1015, 1021 (D.N.J.1996) (Bassler, J.).

In Count I, Farris claims that the renegotiated leases were invalid at the time of their formation due to economic duress. *See* Compl., Count I. Under New Jersey law, "an otherwise enforceable contract may be invalidated on the ground that it was entered into under 'economic duress.'" *Glenfed Financial Corp. v. Penick Corp.,* 276 N.J.Super. 163, 172, 647 A.2d 852 (App.Div.1994) (citing *Continental Bank v. Barclay Riding Academy, Inc.,* 93 N.J. 153, 175, 459 A.2d 1163 (1983)). "[E]conomic duress requires an assent by one party to an improper or wrongful demand by another under circumstances in which the former has little choice but to accede to the demand, *i.e.,* to do what he otherwise would not have done." *Continental Bank,* 93 N.J. at 176, 459 A.2d 1163 (internal quotations and citation omitted). "[T]he 'decisive factor' is the wrongfulness of the pressure exerted." *Id.* at 177, 459 A.2d 1163. "The term 'wrongful' in this context encompasses more than criminal or tortious acts, for conduct may be legal but still oppressive[;] ... acts and threats ... are wrongful, [although] not necessari-

ly in a legal, but in a moral or equitable sense." *Id.* (quoting *Wolf v. Marlton Corp.,* 57 N.J.Super. 278, 287, 154 A.2d 625 (1959) (internal quotations omitted)).

In *Continental Bank,* the New Jersey Supreme Court analyzed the doctrine of economic duress as follows:

> Each case must be examined to determine if the threatening party acted wrongfully. The situations are so varied that one cannot be sure of a simple formula.... One point has tended to become more certain: Where there is adequacy of consideration, there is generally not duress. Whenever a party to a contract seeks the best possible terms, there can be no rescission merely upon the grounds of "driving a hard bargain." Merely taking advantage of another's financial difficulty is not duress. Rather, the person alleging financial difficulty must allege that it was contributed to or caused by the one accused of coercion. Under this rule the party exerting pressure is scored only for that for which he alone is responsible.

*Continental Bank,* 93 N.J. at 177, 459 A.2d 1163 (citing 13 Williston, *Contracts,* § 1617 at 708 (3d ed.1970)) (internal quotations and additional citations omitted).

■ Consistent with this case-by-case analysis, the existence of "duress is ... one of fact in the particular case, to be determined on consideration of the surrounding circumstances, such as age, sex, capacity, state of health, temperament, situation and relation of parties[.]" *McBride v. Atlantic City,* 146 N.J.Super. 498, 506, 370 A.2d 69 (Law Div.1974), *aff'd,* 146 N.J.Super. 406, 370 A.2d 20 (App.Div. 1975), *aff'd* 72 N.J. 201, 370 A.2d 1 (1976). In addition, "basic to the legal concept of duress, proceeding as it does from the unreality of the apparent consent, the controlling factor is the condition, at the time, of the mind of the person subjected to the alleged coercive measures, rather than the means by which the given state of mind was induced, and thus the test is essentially subjective." *McBride,* 146 N.J.Super.

at 503, 370 A.2d 69 (citing *Rubenstein v. Rubenstein,* 20 N.J. 359, 120 A.2d 11 (1956)); *see also Shanley & Fisher v. Sisselman,* 215 N.J.Super. 200, 212, 521 A.2d 872 (App.Div.1987) (discussing fact sensitive analysis of duress and stating that "the court should be particularly hesitant in granting summary judgment where questions dealing with subjective elements such as ... duress are involved"); *accord Abraham,* 183 F.3d at 287 ("Cases that turn crucially on the credibility of witnesses' testimony in particular should not be resolved on summary judgment.").

■ Camden County contends that, because the renegotiated leases were supported by consideration, namely an initial rental term of $9.00 per square foot, "[i]t is ... apparent as a matter of law that ... economic duress cannot be a defense to enforcement [of the renegotiated leases]." *See* County's Brief at 18 (citation omitted). The County's contention is without merit. While the *Continental Bank* court did discuss the adequacy of consideration as a factor to be considered in determining the existence of economic duress, 93 N.J. at 177, 459 A.2d 1163, the adequacy of the consideration is not the decisive factor. Rather, the decisive factor is the wrongfulness of the pressure exerted. *Id.* In other words, the key inquiry is whether the County "contributed to or caused" Farris's financial difficulty. *Id.* (citations omitted).

■ In this case, there is disputed evidence in the summary judgment record that the County was withholding rent due under the original leases to force Farris to agree to the reduced rental rate and the thirty-day termination provision in the renegotiated leases. *See* Farris Dep. (Aug. 12, 1998) at 335; Valenti Cert., Exh. 13 at 70–71. While the County's withholding of rents was not the only cause of Farris's financial distress, *see* County's Brief at 10–11 (listing the judgments obtained by Farris's creditors), it certainly "contributed to" his financial difficulties. *Continental Bank,* 93 N.J. at 177, 459 A.2d 1163. The

disputed issues of material fact surrounding the County's purpose in withholding the rent due on the 1300 and 1350 Buildings, as well as the credibility of Farris's testimony that he was coerced into renegotiating the original leases, *see* Farris Dep. (Aug. 12, 1998) at 335; *see also* Sasala Dep. at 29–31, cannot be resolved on a motion for summary judgment. *See Abraham,* 183 F.3d at 287; *Shanley & Fisher,* 215 N.J.Super. at 212, 521 A.2d 872. Because claims for rescission and reformation are equitable remedies, these issues of fact must be resolved, not by a jury, but by the Court, sitting in equity, after a trial on the merits of Farris's claim for rescission or reformation of the renegotiated leases.

■ The County contends, in the alternative, that by entering into the renegotiated leases, Farris waived his right to seek rescission or reformation of the renegotiated leases on the basis of duress. *See* County Brief at 18–19. The County further contends that Farris should be equitably estopped from seeking reformation or rescission because he has taken a position which is materially different from the position he took in entering into the renegotiated leases. *See* County's Brief at 20. Both of these contentions are without merit.

Under New Jersey law:

Waiver is the intentional relinquishment of a known right. It implies an election by a party to forego some advantage which he might have otherwise demanded. It presupposes full knowledge of the right and an intentional surrender, and it cannot be predicated on consent given under a mistake of fact. However, an intention to waive need not be manifested expressly but may be spelled out from a state of facts exhibiting full knowledge of the circumstances producing a right and continuing indifference to exercise of that right. Judicial estoppel is a preclusion by law against the taking of a position inconsistent with that previously assumed and intended to influence the conduct of another, if such

repudiation would not be responsive to the demands of justice and good conscience and would work prejudice and injury to another. It differs from a waiver in that waiver operates unilaterally without regard to the rights of others or to reliance by others.

*Belfer v. Merling,* 322 N.J.Super. 124, 139, 730 A.2d 434 (App.Div.1999) (citations and internal quotations omitted).

Because waiver involves the subjective intention of a party to relinquish a known right, *Shanley & Fisher,* 215 N.J.Super. at 212, 521 A.2d 872, "waiver is basically a question of intention, and usually a matter for the trier of fact." *Garden State Buildings, L.P. v. First Fidelity Bank, N.A.,* 305 N.J.Super. 510, 524, 702 A.2d 1315 (App.Div.1997) (citations omitted).

Essentially, the County asks this Court to find that Farris waived his right to seek reformation or rescission of contracts which he alleges that he entered into under duress. Applying the County's logic, all claims challenging the validity of a contract would be waived upon execution of the allegedly invalid contract. Such a rule of law would preclude a party coerced into agreeing to a contract from asserting a claim for its rescission or reformation. "The mere statement of such a proposition is its own refutation." *RTC Mortgage Trust 1994 N–1 v. Fidelity National Title Ins. Co.,* 58 F.Supp.2d 503, 523 (D.N.J. 1999) (Orlofsky, J.).

■ In addition, Farris repeatedly testified that he felt that he "was forced to sign th[e renegotiated] lease[s.]" *See* Farris Dep. (Aug. 12, 1998) at 335. Thus, there is clearly conflicting evidence in the summary judgment record on the issue of whether Farris "elect[ed] . . . to forego some advantage which he might have otherwise demanded[,]" namely, the right to sue for rescission or reformation on the basis of duress. *Belfer,* 322 N.J.Super. at 139, 730 A.2d 434. Whether or not Farris intended to waive his legal remedies is an issue that goes to the credibility of Farris's testimony; as such, it is a question which

must be resolved at trial, and not on a motion for summary judgment. *See Abraham,* 183 F.3d at 287; *Shanley & Fisher,* 215 N.J.Super. at 212, 521 A.2d 872.

Similarly, it would be unreasonable to find Farris's claim for rescission or reformation on the basis of duress barred by the doctrine of equitable estoppel. The County contends that it reasonably and justifiably relied on the fruits of its allegedly coercive and oppressive conduct. *See* County's Brief at 20. As Farris correctly points out, "[a] prerequisite of equitable estoppel is the good faith reliance by one party on the conduct of another to the detriment of the relying party." *See* Plaintiff's Brief in Opposition to County of Camden's Motion for Summary Judgment (filed Apr. 30, 1999) at 38 ("Pl. County Brief") (citing *Lizak v. Faria,* 96 N.J. 482, 499, 476 A.2d 1189 (1984)); *see also Hakimoglu v. Trump Taj Mahal Assocs.,* 876 F.Supp. 625, 638 (D.N.J.1994) (Simandle, J.), *aff'd* 70 F.3d 291 (3d Cir.1995) ("Estoppel ... is designed to prevent an injustice where an innocent party has relied upon a misrepresentation to his detriment[;] ... [s]ubstantial, detrimental reliance is not enough[,] only justified and reasonable reliance warrant application of equitable estoppel") (citations and internal quotations omitted); *Plemmons v. New Jersey Auto. Full Ins. Underwriting Ass'n,* 263 N.J.Super. 151, 160, 622 A.2d 275 (App.Div.1993); *Lehen v. Atlantic Highlands Zoning Bd. Of Adjustment,* 252 N.J.Super. 392, 400, 599 A.2d 1283 (App.Div.1991). Clearly, one cannot reasonably rely in good faith on a benefit wrongfully obtained.

Therefore, I conclude that genuine disputed issues of material fact exist as to whether Farris entered into the renegotiated leases under economic duress. Accordingly, I shall deny Camden County's motion for summary judgment on Count I of the Complaint.

b. *Count II, Rescission or Reformation on the Basis of Fraud and Misrepresentation*

In Count II of the Complaint, Farris alleges that employees of the County, namely, Benton and Mitchell, made fraudulent misrepresentations during the renegotiations of the leases, to induce Farris to accept the reduced rental rate and the thirty-day termination provision. *See* Compl., Count II. Specifically, Farris contends that Benton and Mitchell made the following fraudulent misrepresentations: (1) "that there was space available in the RCA Building which Camden County could move into virtually rent free ...."; (2) that the County "would vacate the Plaintiff's premises unless Plaintiff agreed to the County's terms[;]" and (3) "that the terms Camden County was demanding in connection with the [renegotiated leases], including the downward spiraling rental rates and the 30 day termination clause ... [were] required by and in accordance with new guidelines and requirements established by Camden County...." *See* Compl., ¶¶ 85–87. Based on these allegations, Farris claims that he is entitled to rescission or reformation of the renegotiated leases. *See id.,* Count II.

In support of its motion for summary judgment, the County contends that Farris "labors under the misimpression that the County's statements[, that it was exploring the possibility of consolidating all operations in the former RCA building,] were false." *See* County's Brief at 13. Camden County contends that the evidence in the summary judgment record establishes that "[t]he County's interest in the RCA building unquestionably was genuine and persisted well beyond the date when the renegotiated lease was executed." *Id.* at 14 (citations omitted).

"Both rescission and reformation are available remedies in an action for equitable fraud." *Esoldi,* 930 F.Supp. at 1021. "Fraud in the equitable sense differs from fraud in the legal sense because it does not require proof of scienter." *Id.* In *Bonnco Petrol,* the New Jersey Supreme Court discussed the difference between legal and equitable fraud, stating:

A misrepresentation amounting to legal fraud consists of a material representation of a presently existing or past fact, made with knowledge of its falsity and with the intention that the other party rely thereon, resulting in reliance by that party to his detriment. The elements of scienter, that is, knowledge of the falsity and an intention to obtain an undue advantage therefrom, are not essential if plaintiff seeks to prove that a misrepresentation constituted only equitable fraud. Thus whatever would be fraudulent at law will be so in equity; but the equitable doctrine goes farther and includes instances of fraudulent misrepresentations which do not exist in the law.

*Bonnco Petrol*, 115 N.J. at 609, 560 A.2d 655 (internal quotations and citations omitted); *see also Esoldi*, 930 F.Supp. at 1021.

■ "In New Jersey, the five elements of common-law fraud are: (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Lithuanian Commerce Corp.*, 179 F.R.D. at 475–76 (quoting *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 610, 691 A.2d 350 (1997) (citing *Jewish Center of Sussex County v. Whale*, 86 N.J. 619, 624–25, 432 A.2d 521 (1981))) (internal quotations omitted). Thus, to state a claim for rescission or reformation on the basis of equitable fraud, "it is not necessary for [Farris] to establish that [the County and its agents] had an intent to defraud." *Esoldi*, 930 F.Supp. at 1021.

■ Applying this standard, it is clear that genuine issues of material fact exist precluding the entry of summary judgment on Count II of the Complaint. As the County correctly points out, Mitchell testified that he was directed to renegotiate Farris's leases to include a thirty-day termination clause to enable the County to relocate its operations in the RCA building, when that space became available in early to mid 1992. *See* Mitchell Dep. at 62–63, 70; *see also* Coyne Cert., Exh. F (Camden County Internal Memorandum (dated June 16, 1992) (discussing County's prospective purchase of the RCA building)); Benton Dep. at 118. In addition, in Mitchell's surreptitiously taped telephone conversations with Willis, Mitchell informed Willis that the County was seriously considering relocating to the RCA building, but that it was unlikely that any move would happen quickly given that the RCA building would require substantial renovation. *See* Valenti Cert., Exh. 15 (Transcript at 19–22). Moreover, Sasala testified that, in 1991, it was the County's intention to consolidate office space in the RCA building. *See* Sasala Dep. at 18–20. Thus, the County correctly contends that the undisputed evidence in the summary judgment record demonstrates that the County had a genuine interest in relocating its operations to the RCA building. This evidence, however, is not dispositive of Farris's claim for equitable fraud.

The fraud of which Farris complains is that Benton and Mitchell, on behalf of the County, represented that if he did not agree to the more onerous terms of the renegotiated leases, the County would immediately move out of the 1300 Building and into the RCA building. *See* Farris Dep. (Aug. 12, 1998) at 331–34. Specifically, Farris testified:

Q: [By Mr. Tambussi] Do you know whether or not in late '91 or early '92 the County could have moved into the old RCA Building?

A: [By Farris] It was my understanding from Tom Mitchell that they could not. When it was all over after the leases were signed, [Mitchell] said to me, "They couldn't have moved in there, because there was a certain stipulation with the RCA Building that they didn't want"—and I'll just put in parentheses—"that kind, the kind of traffic that

my building was getting in the RCA Building."

.    .    .    .    .

Q: Now, you understand that in the event that you didn't sign the [renegotiated] lease, it was your understanding that the County would leave, correct?

A: That's correct.

See id. at 334, 339; see also Coyne Cert., Exh. F (Camden County Internal Memorandum (dated June 16, 1992) (discussing use restrictions on RCA building due to environmental concerns)); Sasala Dep. at 66 (testifying that the RCA building "was not habitable for which the County wanted to use it for at that time"). Farris also testified:

A: [By Farris] [Benton] told me, he said, "Are you aware that the County can move into the old RCA building?" ... And [Benton also] said, "It was in your best interest ... to renegotiate with the County, or they're going to move, and you're going to be out a lot of money."

See Farris Dep. (Aug. 12, 1998) at 332.

In his deposition, Benton denied making any such statements to Farris. See Benton Dep. at 118–19. Benton further testified that he was not aware of whether the RCA building was available for the County to move its offices in the spring of 1992. See id. at 119. Thus, while the evidence in the summary judgment record establishes that the County was genuinely interested in moving its offices from the 1300 Building to the RCA building, there are disputed issues of material fact as to whether the County represented to Farris that it would move or could move its operations to the RCA Building immediately, i.e., in April, 1992, if Farris did not execute the renegotiated lease. See Sasala Dep. at 64–66 (testifying that the RCA Building was "not a viable alternative" for the County).

Therefore, although this Court sits in equity in resolving Farris's claim for rescission or reformation on the basis of fraud, given these factual disputes, I cannot determine, without taking testimony and assessing the credibility of the witnesses, whether Benton and/or Mitchell made material misrepresentations of a presently existing fact, specifically, the immediate availability of the RCA building. Accordingly, I shall deny Camden County's motion for summary judgment on Count II of the Complaint.

c. Count III, Rescission or Reformation on the Basis of Unconscionability

In Count III of the Complaint, Farris alleges that the renegotiated lease, containing the reduced rental rate and the thirty-day termination provision, was unconscionable. See Compl., Count III. In a parenthetical to its Reply Brief, the County states in a most conclusory fashion that "the lease terms were not manifestly unfair or oppressive." See Reply Brief of County in Support of Motion for Summary Judgment (filed Apr. 30, 1999) at 4 ("County's Reply Brief") (citing Howard v. Diolosa, 241 N.J.Super. 222, 230, 574 A.2d 995 (App.Div.1990)).

"A contract is unenforceable [as unconscionable] if its terms are manifestly unfair or oppressive and are dictated by a dominant party." Howard, 241 N.J.Super. at 230, 574 A.2d 995 (citation omitted). A "[p]laintiff must demonstrate unconscionability by showing some overreaching or imposition resulting from a bargaining disparity between the parties, or such patent unfairness in the contract that no reasonable person not acting under compulsion or out of necessity would accept its terms." Id. (citations omitted).

In Lithuanian Commerce Corp., I noted that "[d]espite the passage of years, courts in New Jersey remain unable to decide whether the existence of substantially equal bargaining power is a question of law for the court or a question of fact for the jury." See Lithuanian Commerce Corp., 179 F.R.D. at 475 n. 13 (citations omitted). I did not have to resolve this issue in Lithuanian Commerce Corp. be-

cause I concluded that no material facts were in dispute.

In this case, I also need not resolve the issue, but for a different reason. Farris's allegation of unconscionable contract terms is made in the context of a claim for rescission or reformation of the renegotiated leases. *See* Compl., Count III. Because the Court sits in equity in considering this claim, *Bonnco Petrol*, 115 N.J. at 612, 560 A.2d 655, the ultimate resolution of both questions of fact and law posed by Farris's allegation of unconscionability must be resolved by the Court.

Viewed in a vacuum, the reduced rental rate and the thirty-day termination clause contained in the renegotiated leases are not patently unfair. Clearly, the renegotiated leases were supported by consideration, specifically, an initial rental rate of $9.00 per square foot. In addition, the thirty-day termination clause, while only providing for a brief notice period did not render the contract illusory. *Cf. Linan–Faye Construction Co., Inc. v. Housing Authority of the City of Camden*, 49 F.3d 915, 924 (3d Cir.1995) (discussing illusory nature of termination provisions in government contracts); *cf. also Evans v. London Assur. Corp.*, 107 N.J.L. 183, 186, 151 A. 613 (1930) (discussing the requirement of mutuality of obligations in real property contracts).

█ Considering these terms in context with the entire renegotiation transaction, however, I conclude that I cannot resolve this claim on a motion for summary judgment because disputed issues of material fact remain. The record contains evidence that, during the renegotiation of the 1300 Building lease, the County originally offered Farris five dollars a square foot as the rental rate, *see* Farris Dep. (Aug. 12, 1998) at 331, and that Farris rejected the offer. *See id.* This "negotiating" suggests that genuine bargaining over the terms of the renegotiated lease took place. The summary judgment record, however, also contains evidence that Bezich, Mitchell, and Sasala unilaterally de-

termined the downward spiraling rental rate would be $9.00, $8.75, and $8.50, *see* Mitchell Dep. at 150, 151–57; Sasala Dep. at 96, and that this rental term was "dictated" to Farris by the County as non-negotiable during the renegotiation transaction. *See* Mitchell Dep. at 160 ("take it or leave it").

In addition, with regard to the thirty-day termination clause, Mitchell testified that he believed that the clause made the renegotiated lease worthless to Farris given his financial difficulties. Specifically, Mitchell testified:

> [I]f you were a landlord and you're holding a lease of mine that, number one, says that it's a five year lease, but every year the freeholder board comes through ... saying to Mr. Landlord, we're not going to appropriate and make available those funds, we're cutting this program all out, you don't have a lease even though it says five years on the paper. And even more so, if you have the lease that has a 30–day out clause in it, if you try to take that lease to a bank to get financing on your property, the bank's going to laugh at you. So what I said in [the tape recorded telephone call with Willis], that basically what the landlord is holding is shit, in a way it's true. They have a non-bankable lease.

*See* Mitchell Dep. at 223–24. Mitchell also testified that the County was in a superior bargaining position during the renegotiations. He stated:

> The county was in a particular position with [the] Admiral Wilson Boulevard [properties] ... We were the majority of the tenants of those spaces. As a result, obviously Mr. Farris ... wanted the county to continue to rent space in those facilities ... Once we got done speaking with Mr. Farris and he was thinking about whether he was going to accept the lower rents, I received a call from both Bezich and also from Sasala telling me that I had to get back in touch with Mr. Farris and *advise him that there*

had to be a *30–day out clause in the new lease.*

*See id.* at 221–22 (emphasis added).

This evidence of superior bargaining power is contradicted by other portions of Mitchell's deposition testimony. Mitchell testified that when he informed Willis of the County's requirement that the renegotiated 1300 Building lease contain a thirty-day termination clause, Willis, on behalf of Farris, demanded that the clause be reciprocal. *See* Mitchell Dep. at 222–23. This was a demand to which Bezich, on behalf of the County, acceded. *See id.* at 223.

Thus, given the conflicting evidence in the summary judgment record regarding the renegotiations involving the reduced rental rate and the thirty-day termination clause, I conclude that the Court cannot resolve Farris's claim for rescission or reformation of the renegotiated leases on the basis of unconscionability on a motion for summary judgment. In addition, considering this conflicting evidence in the summary judgment record, as well as the disputed issues of material fact involving the County's alleged conduct in contributing to Farris's economic duress, *see* § IV.A.2.a *supra,* and alleged fraudulent misrepresentations during the renegotiation process, *see* § IV.A.2.b *supra,* it is clear that Count III must be tried before me so that the Court can take evidence, hear testimony, and assess the credibility of the witnesses first hand on the issue of unequal bargaining power. *See Abraham,* 183 F.3d at 287. Accordingly, I shall deny the County's motion for summary judgment on Count III of the Complaint.

### d. *Count IV, Breach of the Original 1300 Building lease*

Farris alleges in Count IV of the Complaint that "[b]y failing to comply with the original 1300 Building Lease, and coercing and frauding [sic] Plaintiff into entering into the [r]enegotiated 1300 Building Lease, Defendant Camden County breached the original 1300 Building Leases thereby causing Plaintiff to sustain damages." *See* Compl., ¶ 106. Farris further alleges that "Camden County further breached the 1300 Building Leases by consistently failing to pay rent when it became due." *Id.,* ¶ 107.

In support of its motion for summary judgment, Camden County does not specifically address Farris's claim for breach of the original 1300 Building leases. Obliquely, in its memorandum of law in support of its motion for summary judgment, the County contends that there was nothing wrongful in seeking to renegotiate its leases with Farris prior to their expiration. *See* County's Brief at 12. The County, however, does not address Farris's allegation that its persistent failure to pay rent when due constituted a breach of the 1300 Buildings leases. *See* Compl., ¶ 107. The County does contend that Farris's "assent to the renegotiated lease certainly amounts to an intentional waiver of any rights derived from the original leases[,] *i.e.,* a waiver of any claim for breach of the original 1300 Building lease". *See* County Brief at 19. In addition, the County contends that Farris should be equitably estopped from asserting any claims under the original 1300 Building leases. *See id.* at 20.

Whether or not Farris waived his rights to sue for breach of the original 1300 Building leases, or should be estopped from doing so, depends on the propriety of the renegotiations of those leases. If, as he alleges, Farris entered into the renegotiated leases due to economic duress and fraud, *see* § IV.A.2.a *supra,* then clearly Farris did not waive his rights under the original leases, and Farris was not estopped from asserting a claim for breach because the County could not reasonably rely on the renegotiated leases. *See id.* Thus, for the reasons set forth in section IV.A.2.a *supra,* I conclude that the following disputed issues of material fact exist precluding the entry of summary judgment on Count IV of the Complaint: (1) whether Farris waived his rights under the original leases by entering into the

renegotiated leases; and (2) whether the County relied in good faith on the renegotiated leases such that Farris should be estopped from asserting a claim for breach of the original 1300 Building lease. *See Abraham*, 183 F.3d at 287; *Shanley & Fisher*, 215 N.J.Super. at 212, 521 A.2d 872; *see also Hakimoglu*, 876 F.Supp. at 638. Accordingly, I shall deny Camden County's motion for summary judgment on Count IV of the Complaint.

### e. *Count V, Breach of the Original 1350 Building Lease*

In Count V of the Complaint, Farris alleges a claim for breach of the original 1350 Building lease, entered into in October, 1991. *See* Compl., Count V. Specifically, Farris alleges that "[b]y vacating the premises prior to the end of the lease term and failing to make lease payments pursuant to the 1350 Building Lease as they became due, Camden County breached the 1350 Building Lease constituting a breach of contract by reason of which Plaintiff sustained damage." *See id.*, ¶ 112.

Camden County contends that Farris waived any claim he had for breach of the 1350 Building lease "[b]y accepting the settlement in April of 1992 and executing [another] lease [for the 1350 Building] in November of 1992[.]" *See* County's Reply Brief at 6. The County further contends that its failure to pay rent on the 1350 Building was justified by the terms of the lease, which provided that it was "mutually understood and agreed between the parties that all financial obligations undertaken by the [County] under [the 1350 Building] lease including, but not limited to rent, [were] subject to the availability and appropriation of sufficient funds by the by the Board of Chosen Freeholders ..." *See id.* at 5; *see also* Valenti Cert., Exh. 13 (1350 Building Lease (dated Oct. 10, 1991), ¶ 27).

On April 1, 1992, the County informed Farris by letter that "[t]he Board of Cho-

sen Freeholders of the County of Camden in its adoption of the 1992 Temporary Budget and its proposed 1992 Permanent Budget failed to make available or appropriate funds for the rental of 1350 Admiral Wilson Boulevard for the year 1992." *See* Valenti Cert., Exh. 14 (Letter to Rahn J. Farris from Thomas A. Mitchell (dated Apr. 1, 1992)). The April 1, 1992, letter further informed Farris that, due to the unavailability of appropriated funds, the County was terminating the 1350 Building lease. *See id.* In addition, Farris admits in his Complaint that "on April 30, 1992, the three months [rent due] on the 1350 Building [was] paid." *See* Compl., ¶ 62; *see also* Valenti Cert., Exh. 15 (Transcript at 24, 30); Coyne Cert., Exh. E (Memorandum from Louis S. Bezich to Jeffrey L. Nash and James Beach (dated April 2, 1992)); Bezich Dep. at 80–90.

A close reading of Count V reveals that Farris's specific claim for breach is limited to the County's failure to pay rent as it became due in January, February, and March, 1992, and the County's decision to vacate the premises prior to the expiration of the lease term. *See* Compl., ¶ 112. Given the undisputed evidence in the summary judgment record, I conclude that the County did not breach the 1350 Building lease in the manner alleged by Farris in Count V of the Complaint.[17] The undisputed evidence in the summary judgment record establishes: (1) that the County had the right to terminate the 1350 Building lease if the funds for rental payments were not appropriated by the Board of Chosen Freeholders, *see* Valenti Cert., Exh. 13, ¶ 27; (2) the County gave Farris notice of the unavailability of funds, as well as notice of its decision to terminate the lease pursuant to paragraph 27, *see id.*, Exh. 14; and (3) the County paid Farris the rent due for the months of January, February, and March, 1992. *See* Compl., ¶ 62.

---

17. *But see* § IV.A.2.h *infra.*

Therefore, because the undisputed facts in the summary judgment record establish that the County did fulfill its rental obligations under the original 1350 Building lease for the months of January, February, and March, 1992, and that paragraph 27 of the lease agreement gave the County the right to terminate the lease for unavailability of appropriated funds, I conclude that the County did not breach the 1350 Building lease in the manner alleged in Count V of the Complaint. Accordingly, I shall grant Camden County's motion for summary judgment on Count V of the Complaint.

### f. *Count VI, Common Law Fraud*

Farris's claim for common law fraud against the County is premised upon the same alleged fraudulent conduct as his claim for rescission and reformation of the renegotiated lease on the basis of equitable fraud, set forth in Count II of the Complaint, namely, that the County was prepared to vacate Farris's buildings immediately and relocate its offices to the RCA building. *Compare* Compl., Count VI, *with* Compl., Count II; *see* § IV.A.2.b *supra.* The same facts disputed with reference to Farris's claim for equitable fraud are similarly disputed in relation to Farris's claim for common law fraud. *See* § IV.A.2.b *supra.*

These factual disputes, however, do not presage the denial of the County's motion for summary judgment on Count VI of the Complaint. Unlike equitable fraud, as I discussed previously in section IV.A.2.b *supra,* a claim for common law fraud requires Farris to establish that the County acted with scienter. *Bonnco Petrol,* 115 N.J. at 609, 560 A.2d 655; *Esoldi,* 930 F.Supp. at 1021. The elements of scienter are: (1) knowledge of the falsity of the representation; and (2) "an intention to obtain an undue advantage therefrom[.]" *Bonnco Petrol,* 115 N.J. at 609, 560 A.2d 655 (quoting *Jewish Center of Sussex County v. Whale,* 86 N.J. 619, 624–25, 432 A.2d 521 (1981)) (additional citations omitted); *see also Esoldi,* 930 F.Supp. at 1021.

Even assuming that Farris has placed sufficient evidence in the summary judgment record demonstrating a triable issue of fact about whether the County had knowledge of the falsity of the representations alleged to have been made by Benton and Mitchell during the renegotiation transactions, I conclude that the County is entitled to summary judgment on Count VI of the Complaint. In the Complaint, Farris alleges that Camden County "is a County located in the State of New Jersey and a political subdivision thereof." *See* Compl., ¶ 7. The New Jersey Tort Claims Act ("NJTCA"), N.J. Stat. Ann. § 59:2–10 (West 1998), provides that "[a] public entity is not liable for the acts or omissions of a public employee constituting a crime, actual fraud, actual malice or willful misconduct." *Id.* The Comment to this section, which must be given "something close to binding effect[,]" *Civalier by Civalier v. Estate of Trancucci,* 138 N.J. 52, 67, 648 A.2d 705 (1994), "adopts the principle enunciated in *O'Connor v. Harms, et al.,* 111 N.J.Super. 22, 26–27, 266 A.2d 605 (App.Div.1970) that: 'a public corporation, such as a city or other public body, by reason of its being an artificial legal entity created by law to perform limited governmental functions, cannot entertain malice, as a public corporation.'" *ABB Daimler–Benz Transp. Inc. v. National Railroad Passenger Corp.,* 14 F.Supp.2d 75, 90 (D.D.C.1998) (applying New Jersey law, and holding that NJTCA bars claims for fraud, conspiracy to defraud and tortious interference, asserted against a municipal corporation); *see also Martin v. Township of Rochelle Park,* 144 N.J.Super. 216, 222, 365 A.2d 197 (App.Div.1976); *accord Lohman v. Township of Oxford,* 1992 WL 95914, at *5 (E.D.Pa. Apr.22, 1992) (applying New Jersey law); 45 *Am.Jur.2d Interference* § 7 (1999).

Although the *O'Connor* court stated that the NJTCA barred claims against municipal entities where " 'malice' is an essential

ingredient of the tort[,]" *O'Connor*, 111 N.J.Super. at 27, 266 A.2d 605, the principle applies with equal force to tort claims where scienter is an element of the cause of action. *See ABB Daimler–Benz Transp.*, 14 F.Supp.2d at 90. "Malice," in the context of a tort claim, "is defined to mean that the harm was inflicted intentionally and without justification or excuse." *Printing Mart–Morristown v. Sharp Electronics Corp.*, 116 N.J. 739, 751, 563 A.2d 31 (1989) (citations omitted). Similarly, to establish scienter, in the context of a claim for common law fraud, a plaintiff must show that the defendant had an intention to obtain an undue advantage from the alleged false representation. *Bonnco Petrol*, 115 N.J. at 609, 560 A.2d 655. In other words, to show scienter, a plaintiff must produce evidence that the defendant acted with the intention of causing the plaintiff harm. *See Esoldi*, 930 F.Supp. at 1021 (equating scienter with "an intent to defraud"). Thus, the question of whether a public corporation can form the tortious intent of malice is functionally the same as whether a public corporation can form an intent to defraud.

Therefore, because the NJTCA provides that a public corporation cannot, as a matter of law, entertain the tortious intent of malice, I conclude, as a matter of law, that Farris cannot assert a claim for common law fraud against the County, because the County, as a public corporation, cannot form the tortious intent of scienter. *ABB Daimler–Benz Transp.*, 14 F.Supp.2d at 90. Accordingly, I shall grant Camden County's motion for summary judgment on Count VI of the Complaint.

### g. *Count VII, Breach of Contract/Conversion*

In Count VII of the Complaint, Farris alleges a claim for breach of contract and/or conversion against the County. Specifically, Farris alleges:

In or about March of 1994, [Camden County] paid various lease payments that were due Plaintiff on the Renegotiated 1300 Building lease totaling 53,-740.00 directly to Commerce Bank. No assignment of lease payments for the Renegotiated 1300 lease payments [sic] there [sic] any other authorization to pay such monies directly to Commerce Bank existed and such monies rightfully belonged to Plaintiff.

*See* Compl., ¶¶ 123–24.[18]

■ As a preliminary matter, "[u]nder New Jersey law, a 'dispute [that] clearly arises out of and relates to [a] contract and its breach' sounds in contract and not in tort." *See Stewart Title Guar. Co. v. Greenlands Realty Co.*, 58 F.Supp.2d 370, 386 (D.N.J.1999) (quoting *Wasserstein v. Kovatch*, 261 N.J.Super. 277, 286, 618 A.2d 886 (N.J.Super.Ct.App.Div.1993)). Therefore, to the extent that Count VII alleges a cause of action, if any, that cause of action is for breach of contract and not the tort of conversion. *See id.*

The County, in support of its motion for summary judgment, does not address Count VII of the Complaint. *See* County's Brief; *see also* County's Reply Brief. "[A] party seeking summary judgment . . . bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548 (citing Fed. R.Civ.P. 56(c)). Thus, the County had the initial burden to bring a properly supported motion for summary judgment on Count VII of the Complaint. It has failed to do so.

---

18. The summary judgment record contains only one document entitled assignment of leases, entered into by Farris and Commerce Bank. *See* Coyne Cert., Exh. B (Assignment of Leases (dated Dec. 30, 1991)). This assignment of leases covers Farris's lease with the County for the 1350 Building, not the 1300 Building. *See id.*

In addition, the contract defenses that the County does assert, namely, waiver and estoppel, cannot apply to this claim for breach of contract because the County's contentions are that, by executing the renegotiated leases, Farris waived, or should be estopped from pursuing, any claims for breach of the original leases. Surely, by executing the renegotiated 1300 Building lease in April, 1992, Farris did not waive any claims based on the County's March, 1994, breach of that lease.

Therefore, I conclude that the County has failed to support properly its motion for summary judgment on Count VII of the Complaint. *See Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548. Accordingly, I shall deny the County's motion for summary judgment on Count VI of the Complaint.

### h. *Count XI, Breach of Duty of Good Faith and Fair Dealing*

In Count XI of the Complaint, Farris alleges that "[e]ach of the lease agreements entered into between Plaintiff and Camden County contained an implied covenant of good faith and fair dealing." *See* Compl., ¶ 149. Farris further alleges that the County breached this implied duty by renegotiating the 1300 Building and 1350 Building leases in bad faith, *i.e.,* allegedly contributing to and taking advantage of Farris's economic duress, and allegedly making fraudulent misrepresentations about the immediate availability of the RCA building. *See* Compl., Count XI (incorporating Farris's previous allegations by reference); *see also* § IV.A.2.a-b.

The County contends that it is entitled to summary judgment on Count XI of the Complaint because Farris waived any claims for breach of the 1300 Building and 1350 Building leases by entering into the renegotiated leases in April and November, 1992, respectively. *See* County Brief at 18–19; *see also* County's Reply Brief at 6 ("The waiver ... extends to claims of breach of contract and claims for breach of the implied covenant of good faith and fair dealing").

"The obligation to perform in good faith exists in every contract, including those contracts that contain express and unambiguous provisions permitting either party to terminate the contract without cause." *Stewart Title,* 58 F.Supp.2d at 385 (quoting *Sons of Thunder v. Borden, Inc.,* 148 N.J. 396, 421, 690 A.2d 575 (1997)); *see also Lithuanian Commerce Corp.* 179 F.R.D. at 482. "Good faith is defined as honesty in fact in the conduct or transaction concerned." *Sons of Thunder,* 148 N.J. at 421, 690 A.2d 575 (quoting N.J. Stat. Ann. § 12A:1–201(19)); *see also Stewart Title,* 58 F.Supp.2d at 385. "The implied covenant of good faith and fair dealing imposes duties that exist as part of every contract formed in New Jersey." *Stewart Title,* 58 F.Supp.2d at 385 (citing *Sons of Thunder,* 148 N.J. at 421, 690 A.2d 575).

Because the summary judgment record contains disputed issues of material fact regarding whether the County renegotiated the 1300 Building and 1350 Building leases in good faith, Camden County's motion for summary judgment on Count XI of the plaint must be denied. First, to the extent that the County contends that Farris waived his claim for breach of the implied covenant of good faith and fair dealing, or should be estopped from asserting such a claim, *see* County's Brief at 18–20, because he entered into renegotiated leases with the County, I conclude, for the reasons set forth in section IV.A.2.a *supra,* that a jury must resolve the disputed issues of fact regarding whether Farris intended to waive this claim, or whether the renegotiated leases were the product of the County's equitable fraud and contribution to Farris's economic duress.

Second, independent of the issue of waiver, as I discussed above in section IV.A.2.b-f *supra,* disputed issues of material fact exist as to whether the County misrepresented through Benton and Mitchell, County employees acting within the scope of their employment, the availability of the RCA building in an effort to

induce Farris to agree to the reduced rental rate and thirty-day termination clause contained in the renegotiated leases. *See* § IV.A.3.b *infra.* Given this dispute of material fact, I cannot determine as a matter of law whether Camden County, through its authorized agents, acted with "honesty in fact in the ... [renegotiation] transaction[.]" *Sons of Thunder,* 148 N.J. at 421, 690 A.2d 575.

Third, while the County did not breach the 1350 Building lease by terminating it due to the unavailability of appropriated funds, *see* § IV.A.2.e *supra,* the question remains whether the County should have informed Farris prior to its April 1, 1992, letter that the Board of Chosen Freeholders had not appropriated the funds necessary to make the rental payments under the 1350 Building lease. *See Sons of Thunder,* 148 N.J. at 421, 690 A.2d 575 (stating that a party with the right to terminate the contract must do so in compliance with the duty of good faith and fair dealing); *see also* Valenti Cert., Exh. 14; Coyne Cert. Exh. E; Mitchell Dep. at 146–47. In a memorandum to the Board of Chosen Freeholders, dated April 2, 1992, Bezich informed the Freeholders that the 1350 Building had been "unoccupied since January 1, 1992[,]" and that Bezich was directing Mitchell "to immediately notify [ ] Farris that [the County was] exercising the no-funding provision in the lease...." *See* Coyne Cert., Exh. E. Mitchell had personally delivered such a letter to Farris the day before on April 1, 1992. *See* Valenti Cert., Exh. 14.

At his deposition, Mitchell testified that "in the beginning of 1992 [the Board of Chosen Freeholders determined] that they did not want to take occupancy of the 1350 building." *See* Mitchell Dep. at 200. Mitchell further testified:

[In December, 1991, the County determined] that [it] definitely wanted to continue [Farris's] lease for [the] 1350 [Building] ... Unfortunately, when I determined that the funds were not available to pay Farris for the [1350 Building

lease], that was complicated, because now I'm dealing with the new board and the Democrats have just taken over, a determination was made in early 1992 that the budget was not going to obtain funds in order to fund 1350; and obviously, if, in fact, the freeholder board did not appropriate and make available funds in the budget of '92 to fund the alleged lease for 1350, ... there would be no lease....

*See* Mitchell Dep. at 202–03. Mitchell, however, testified that in December, 1991: "I ... assured Farris ... that the fact that we were getting rid of [the County official whose program was to be housed in the 1350 Building] would in no way affect the lease of 1350." *See id.* at 204.

Mitchell further testified that the decision to break off negotiations over the 1350 building in early 1992 was made by Bezich. *See* Mitchell Dep.2 at 98. Mitchell testified:

Q: [By Mr. Cureton] Did you believe that the decision to not go into 1350 Admiral Wilson Boulevard was a unilateral decision made by Mr. Bezich?

A. [By Mitchell] Yes.

Q. What caused you to have that opinion? Did he tell you that?

A. Yes.

Q. When did you have this conversation with Mr. Bezich?

A. I don't specifically recall.

Q. Was it in or about the time that you were negotiating the lease renegotiations with Mr. Farris?

A. Approximately the same time, correct.

. . .

[A] deal, basically, was already cut for 1300 and 1350. I was advised by Lou Bezich that we were not going to occupy 1350, to cut that from the deal.

*See* Mitchell Dep.2 at 98–101.

Bezich, however, testified that he was not directly involved in the renegotiation of Farris's leases. *See* Bezich Dep. at 63–64,

67. Bezich further testified that Sasala was "handling" the renegotiation transaction. *See id.* at 67; *see also* Sasala Dep. at 22–25.

Apparently contradicting himself, Bezich later testified that he did not dispute the contents of his April 2, 1992, memorandum, *see* Coyne Cert., Exh. E, in which he directed Mitchell to notify Farris that the County, after negotiating a continuation of the 1350 Building lease in October, 1991, was terminating the lease under paragraph 27, the unavailability of appropriated funds provision, in April, 1992. *See* Bezich Dep. at 89–90. In addition, Sasala testified that Bezich stated, in the context of the back rent due on the 1350 Building for the months of January, February, and March, 1992: "I'll take care of the transaction with Mr. Farris." Sasala Dep. at 30.

■ Thus, I conclude that there are disputed material issues of fact regarding whether the County terminated the 1350 Building lease in good faith in April, 1992. There is conflicting testimony in the summary judgment record as to whether at the time that Mitchell and Sasala were renegotiating the 1300 Building lease with Farris, and notwithstanding Mitchell's assurances to the contrary, Bezich was deciding to terminate the 1350 Building lease under the unavailability of appropriated funds provision. Given these disputes of material fact, I cannot determine as a matter of law whether the County breached its duty of good faith and fair dealing in terminating the 1350 Building lease. Accordingly, I shall deny Camden County's motion for summary judgment on Count XI of the Complaint.

### i. *Count XIII, Conspiracy to Defraud*

In Count XIII of the Complaint, Farris alleges a claim for civil conspiracy against the County. *See* Compl., Count XIII. Specifically, Farris alleges that Camden County conspired with Norcross and the CCDC to "coerce and defraud Plaintiff into entering into [the renegotiated leases]." *See id.*, ¶ 161. In support of its motion for summary judgment, the County contends that, "[t]o support ... a claim [for civil conspiracy], plaintiff must allege some wrongdoing that would be actionable if committed by the County alone[; and] Plaintiff has failed to do so." *See* County's Reply Brief at 6.

The County's contention that it is entitled to summary judgment is predicated upon the principle that "[a] conspiracy is not actionable absent an independent wrong[.]" *Eli Lilly and Co.*, 23 F.Supp.2d at 497 (citing *Tynan*, 248 N.J.Super. at 668–69, 591 A.2d 1024); *see also* County's Reply Brief at 6. In section IV.A.2.f *supra*, I concluded that the NJTCA precludes Farris from alleging a claim for common law fraud against the County. Because a civil conspiracy is "not actionable absent an independent wrong," and because I have granted summary judgment in the County's favor on Farris's claim for common law fraud, so too I must grant summary judgment in favor of the County on Farris's claim for civil conspiracy to defraud. *Eli Lilly and Co.*, 23 F.Supp.2d at 497. Accordingly, I shall grant the County's motion for summary judgment on Count XIII of the Complaint.

### j. *Counts XVII and XIX, Conspiracy to Extort, Blackmail and Deprive Farris of his Real Property*

In Counts XVII and XIX of the Complaint, Farris seeks to allege two additional claims for civil conspiracy against Camden County. *See* Compl., Counts XVII, XIX. In each of these Counts, Farris alleges that the County conspired with Norcross and the CCDC to extort political contributions from Farris, and that these defendants conspired to deprive Farris of his real property, namely, the 1300 and 1350 Buildings. *See id.* In support of its motion for summary judgment, Camden County makes the same argument that it made with reference to Count XII, namely, that Farris has failed to "allege some wrongdoing that would be actionable if committed by the County alone." *See*

County's Reply Brief at 6. With regard to Counts XVII and XIX, I agree.

As a preliminary matter, given that Farris alleges that the County conspired to commit intentional torts, extortion, blackmail and tortious interference with real property, for the reasons set forth in section IV.A.2.f *supra*, I conclude that the County could not form the requisite intent to conspire to commit the torts alleged in Counts XVII and XIX of the Complaint.

■ Alternatively, similar to Count XIII, Farris's claims for civil conspiracy in Counts XVII and XIX do not allege "an act which would be actionable even without the conspiracy." *Eli Lilly and Co.*, 23 F.Supp.2d at 497. Count XVII purports to allege a claim for civil conspiracy to extort and blackmail. This Court's research has uncovered no case in the State of New Jersey recognizing the tort of theft by extortion. Even if this Court were to consider Count XVII as alleging a claim for civil conspiracy based on the torts of conversion or trespass to chattels, Farris has failed to allege the essential elements of such claims. *See Barco Auto Leasing Corp. v. Holt*, 228 N.J.Super. 77, 83, 548 A.2d 1161 (App.Div.1988) ("[T]he tort of conversion ... is defined as an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights.") (citations and internal quotations omitted).

■ In addition, Count XIX, Farris's claim for civil conspiracy to deprive Plaintiff of property, is, functionally, nothing more than a restatement of Farris's claims for tortious interference with contract and his prospective economic advantage. *Compare* Compl., Count XIX, *with* Compl., Counts VIII, IX, X, XII, and XIV. The only substantive difference being that Farris seeks to assert Count XIX against the County, one of the parties in this litigation against whom such a claim cannot be asserted. *See Printing Mart–Morristown v.*

*Sharp Electronics Corp.*, 116 N.J. 739, 752, 563 A.2d 31 (1989) ("'[F]undamental' to a cause of action for tortious interference with a prospective economic relationship [is] that the claim be directed against defendants who are not parties to the relationship[;] ... [t]ortious interference was not meant to upset the rules governing the contractual relationship itself."). It is clear that the County cannot conspire to tortiously interfere with its own contractual or prospective contractual relationship with Farris. Thus, because the harm sought to be redressed in Count XIX flows from the existing and prospective contractual relationship between the County and Farris, any claim Farris has against the County, based on the allegations set forth in Count XIX, must sound in contract, and cannot serve as the basis of a claim for civil conspiracy against the County.

Therefore, because Count XVII and Count XIX fail to allege acts which would be actionable under New Jersey law "even without a conspiracy[,]" *Eli Lilly and Co.*, 23 F.Supp.2d at 497, I conclude that Camden County is entitled to a judgment as a matter of law on these counts. Accordingly, I shall grant the County's motion for summary judgment on Counts XVII and XIX of the Complaint. Furthermore, as with Count XIII, the remaining defendants named in Counts XVII and XIX, namely, Norcross and the CCDC, are also entitled to summary judgment.

### 3. *Mitchell's Motion for Summary Judgment*

#### a. *Count VI, Common Law Fraud*

In Count VI of the Complaint, Farris alleges that Mitchell "advised Plaintiff that unless he agreed to the terms required by Camden County ... [the County] would immediately vacate all premises owned by Plaintiff and would not pay any of the back rent due Plaintiff on any of the leases." *See* Compl., ¶ 117. Mitchell, in support of his motion for summary judgment, contends that "plaintiff simply has no competent evidence whatsoever which could act

as either a factual or legal basis for claims of [fraudulent] misrepresentation ..." *See* Mitchell's Brief in Support of Motion for Summary Judgment (filed May 10, 1999) ("Mitchell's Brief") at 13–14.

As I stated previously, "the five elements of common law fraud are: (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Lithuanian Commerce Corp.*, 179 F.R.D. at 475–76.

In section IV.A.2.b *supra*, considering Farris's claim for rescission or reformation of the renegotiated leases on the basis of equitable fraud, I concluded that disputed material issues of fact exist as to whether Mitchell made a material misrepresentation to Farris that the RCA building was immediately available for the County's use. *See* § IV.A.2.b supra. This dispute of material fact likewise precludes the entry of summary judgment in Mitchell's favor on Count VI of the Complaint, Farris's claim for common law fraud.

In addition, the summary judgment record contains evidence from which a reasonable jury could conclude that Mitchell intended to induce Farris to enter the renegotiated leases based on misrepresentations about the availability of the RCA building. Specifically, Farris testified that Mitchell represented to him that if he did not agree to the County's terms that the County would immediately relocate to the RCA building. *See* Farris Dep. (Aug. 12, 1998) at 333–39. Farris also testified that he relied on these representations in entering into the renegotiated leases. *See id.*

Farris testified that Mitchell told him after the execution of renegotiated leases that the RCA building was not immediately available for the County's purposes. *See* Farris Dep. (Aug. 4, 1998) at 30–32; *see also* Mitchell Dep. at 210–11. Farris further testified that Mitchell's comments were made in the context of an apology for misleading Farris during the renegotiations. *See* Farris Dep. (Aug. 4, 1998) at 30–32. Mitchell testified, however, that his comment as to the unavailability of the RCA building "was only [his] opinion," and that he "had no authority" to comment on the County's intention to relocate its offices to the RCA building. *See* Mitchell Dep. at 211.

Farris's testimony as to Mitchell's statements is admissible as non-hearsay pursuant to Federal Rule of Evidence 801(d)(2)(A), admission by a party opponent. *See* Fed. R. Ev. 801(d)(2)(A). A reasonable jury could infer from Farris's testimony that Mitchell's alleged apology to Farris was evidence of his intention to defraud Farris during the renegotiations. Thus, in addition to the dispute of material fact as to whether Mitchell misrepresented the availability of the RCA building during the renegotiation of Farris's leases, the summary judgment record contains conflicting admissible evidence on the issue of whether Mitchell intended to defraud Farris. Accordingly, given these disputes of material fact, I shall deny Mitchell's motion for summary judgment on Count VI of the Complaint.

### b. *Count VIII, Tortious Interference with Contract and Prospective Economic Advantage*

In Count VIII of the Complaint, Farris alleges that Mitchell, Bezich, and Palombi, all employees of Camden County, tortiously and maliciously interfered with Farris's lease agreements with the County. *See* Compl., Count VII. Specifically, Farris alleges that Mitchell and the other defendants named in Count VIII tortiously interfered with his leases with the County and his prospective economic advantage by "causing Defendant Camden County to breach its lease agreements with Plaintiff by failing to pay rent when due and vacating the 1350 Building Lease prior to the end of its lease term." *Id.*, ¶ 131. Farris

further alleges that Mitchell "coerced and defrauded" him into entering into the re-negotiated leases, and that these actions were undertaken by Mitchell and the other defendants named in Count VII in order to "coerce Plaintiff into making political contributions and in retaliation of Plaintiff's failure to do so . . ." *Id.,* ¶¶ 129, 133.

In support of his motion for summary judgment, Mitchell contends that he is entitled to summary judgment as a matter of law because Farris "has no competent evidence to prove, much less suggest, any malicious or intentional conduct on the part of Mr. Mitchell with respect to the re-negotiation or the entering into leases with the County of Camden." *See* Mitchell's Brief in Support of Motion for Summary Judgment (filed May 10, 1999) ("Mitchell's Brief") at 8. Mitchell further contends that "the evidence is clear that [he] acted as any officer of the court would during the re-negotiation phases." *Id.*

As I stated previously, in New Jersey the elements of a claim for tortious interference are: (1) plaintiff had a continuing or prospective economic relationship or reasonable expectation of economic advantage; (2) the defendant knew of such relationship of expectancy; (3) the interference and harm inflicted were done intentionally and with "malice;" (4) if not for the interference, it was reasonably probable that plaintiff would have realized its economic advantage; and (5) the plaintiff was injured as a result of defendant's conduct. *Eli Lilly and Co.,* 23 F.Supp.2d at 493–94.

In *Printing Mart–Morristown,* the New Jersey Supreme Court stated that "it is fundamental to a cause of action for tortious interference with a prospective economic relationship that the claim be directed against defendants who are not parties to the relationship." *Printing Mart–Morristown,* 116 N.J. at 752, 563 A.2d 31 (citations omitted). The *Printing Mart–Morristown* court further stated:

> Tortious interference developed under common law to protect parties to an existing or prospective contractual relationship from outside interference. However, the rule of tortious interference was not meant to upset the rules governing the contractual relationship itself. Where a person interferes with the performance of his or her own contract, the liability is governed by principles of contract law.

*Id.* at 752–53, 563 A.2d 31 (citations omitted).

In addition, the New Jersey Supreme Court discussed without deciding whether an employee of a contracting party can be found liable for tortiously interfering with their employer's contractual or prospective contractual relationship with a plaintiff. *See id.* at 761, 563 A.2d 31. In *Hurley v. Atlantic City Police Department,* 1995 WL 854478, at *14 (D.N.J. Aug.4, 1995), and *Fioriglio v. City of Atlantic City,* 996 F.Supp. 379, 392 (D.N.J.1998), Judge Irenas was required to determine whether an employee of a contracting party could be held liable for tortious interference. In *Hurley,* Judge Irenas observed:

> In discussing the issue, the [*Printing Mart* ] court first noted that employees could "theoretically" be held liable for interfering with another's contract with the employer because the employee is not a party to the contract. Furthermore, employees generally are not relieved from individual tort liability simply because they act on behalf of the employer. On the other hand, the court noted that while the corporate entity may be the technical party to the employment contact, the corporation can act only through its agents and employees. Employees are also generally immune from tort liability where they exercise a privilege held by the employer. These principles would indicate that the action would not lie against employees . . . Post*Printing Mart* courts have generally found that agents of a corporation cannot be liable for malicious interference with another's contractual relations with the corporation. One court in this

district has also found that where co-employees act within the scope of their employment in harassing a plaintiff, they cannot be held liable for tortious interference with the plaintiff's employment contract. *Obendorfer v. Gitano Group, Inc.,* 838 F.Supp. 950, 956 (D.N.J.1993).

*Hurley,* 1995 WL 854478, at *14 (additional citations omitted). In *Fioriglio,* Judge Irenas revisited this issue, concluding that "employees cannot be liable for interfering with another's contract with their ... employer[,]" where the employees are acting "in the course of their employment." *Fioriglio,* 996 F.Supp. at 392–93; *see also DeJoy v. Comcast Cable Communications,* 941 F.Supp. 468, 477–78 (D.N.J.1996) (Lechner, J.).

In opposing Mitchell's motion for summary judgment, Farris contends that Mitchell was acting outside the scope of his employment with the County in renegotiating the leases. *See* Plaintiff's Brief in Opposition to Mitchell's Motion for Summary Judgment (filed May 10, 1999) at 17–19. I disagree; the undisputed evidence in the summary judgment record establishes that Mitchell was acting "in the course of [his] employment" when he renegotiated the County's leases with Farris. *Fioriglio,* 996 F.Supp. at 392–93.

Farris testified that his claims against Mitchell stem from Mitchell's involvement in the renegotiation of Farris's leases with the County. *See* Farris Dep. at 30–31. Farris testified:

Q. [By Mr. Garrigle] Did Mr. Mitchell ever ask you for a political donation in order to get your rent paid?

A. [By Farris] No, he did not.

Q. Did Mr. Mitchell ever ask you for any money in order to get your rent paid?

A. No, he did not.

Q. What did Mr. Mitchell do that you allege gave you a basis for your claim against him?

A. Mr. Mitchell was well aware of what I had gone through with Mr. Norcross ... And he was aware that Lou Bezich had a large amount of dollars sitting on his desk that was told to me straight out by Mr. Mitchell ... that it was all political ... The biggest problem I had with Mr. Mitchell is when I negotiated my rent and I was told that ... the County could move to the RCA building for virtually no rent at all. It was told to me by Mr. Mitchell after the leases were signed within a good month he virtually apologized that that was not true, that the RCA building did not want the same clientele in that building as I had in my building. And he apologized for misleading me.

.      .      .      .      .

Along with the fact on my lease they gave me a 30 day out clause. Mr. Mitchell indicated to me that all the leases throughout the County were all going to be changed to represent the same [rental rates].

*Id.; see also id.* at 34.

Thus, the viability of Farris's claim for tortious interference against Mitchell depends on whether Mitchell's representations about the availability of the RCA building, the reduced rental rate, and the thirty-day termination provision, were made within the scope of his employment as an assistant county counsel. *See Fioriglio,* 996 F.Supp. at 392–93. After reviewing the evidence in the summary judgment record, it is clear that these representations were made in the course of Mitchell's employment with the County. First, Mitchell testified that he was directed by Bezich and Sasala, the County employees overseeing the renegotiations of Farris's leases, to "advise [Farris] that there had to be a 30–day out clause in the new lease." *See* Mitchell Dep. at 222; *see also* Sasala Dep. at 96–97. Sasala testified that inclusion of the thirty-day termination provision was consistent with "the direction the county was moving in[.]" *See* Sasala Dep. at 97.

Second, Mitchell also testified that he, Bezich, and Sasala, determined the appropriate rental rate for the renegotiated leases pursuant to a new policy of the Board of Chosen Freeholders "to lower the cost of county government as much as possible." *See* Mitchell Dep. at 150, 151–57; *see also id.* at 100. At his November 13, 1998, deposition, Sasala testified that the downward-spiraling, reduced rental rate "was [his] idea." *See* Sasala Dep. at 96.

Third, as I discussed in section IV.A.2.b *supra,* it cannot reasonably be disputed that the County, in late 1991 and early 1992, was interested in consolidating office space in the RCA building. *See* § IV.A.2.b. *supra.* Sasala testified that the thirty-day termination clause "was tied into the county having maximum flexibility ... [in being able to] consolidat[e] office space down at [the RCA building]." *Id.* at 98–99; *see* Mitchell Dep. at 62–64.

Thus, it is clear that Mitchell's representations, during the renegotiation of Farris's leases, about the reduced rental rate, the thirty-day termination provision, and the County's interest in the RCA building, were made in the course of his employment as assistant county counsel. Farris's contentions that Mitchell deliberately misrepresented the availability of the RCA building and the universal inclusion of the reduced rental rates and the thirty-day termination provision in all the County's leases goes to the question of whether Mitchell committed common law fraud, *see* § IV.A.2.a *supra,* and not to Farris's claim for tortious interference.

■ Therefore, I conclude that the undisputed evidence in the summary judgment record establishes that Mitchell was acting within the scope of his employment during the renegotiations of Farris's leases with the County. Accordingly, because Mitchell, as an employee acting within the scope of his employment, cannot tortiously interfere with the contractual or prospective contractual relationship of his employer, the County, *see Fioriglio,* 996 F.Supp. at 392–93, I shall grant Mitchell's motion

for summary judgment on Count VIII of the Complaint.

#### c. *Count XII, Conspiracy to Tortiously Interfere and Defraud*

In Count XII of the Complaint, Farris alleges that Mitchell conspired with Norcross, the CCDC, Bezich, and Palombi to "tortiously interfere with Plaintiff's leases with Camden County ..." *See* Compl., ¶ 157. As discussed in section IV.A.3.b *supra,* a county employee "cannot be liable for interfering with another's contract with [his] ... employer." *Fioriglio,* 996 F.Supp. at 392. Thus, I conclude that Farris has failed to allege that Mitchell "committed an act which would be actionable even without the conspiracy." *Eli Lilly and Co.,* 23 F.Supp.2d at 497. Accordingly, I shall grant Mitchell's motion for summary judgment on Count XII of the Complaint, insofar as it alleges a claim for civil conspiracy to tortiously interfere.

In Count XII, Farris also alleges that Mitchell conspired with Norcross, the CCDC, Bezich, and Palombi to defraud Farris in the manner set forth in sections IV.A.2.b-f and IV.A.3.a *supra.* For the reasons discussed in those sections, I shall deny Mitchell's motion for summary judgment on Count XII insofar as it alleges a claim for civil conspiracy to defraud.

#### d. *Counts XV and XVIII, Conspiracy to Extort, Blackmail and Deprive Farris of his Real Property*

In Counts XV and XVIII of the Complaint, Farris alleges that Mitchell conspired with Norcross, the CCDC, Bezich, and Palombi, to extort political contributions from Farris, and that these defendants conspired to deprive Farris of his real property, namely, the 1300 and 1350 Buildings. *See id.* For the reasons set forth in section IV.A.2.j *supra,* I shall grant Mitchell's motion for summary judgment on Counts XV and XVIII of the Complaint because Farris has failed to allege an actionable independent wrong.

*See Eli Lilly and Co.*, 23 F.Supp.2d at 497; *see also Fioriglio*, 996 F.Supp. at 392.

## V. CONCLUSION

For the reasons set forth in this opinion, I shall deny the motion of Defendants, Norcross and the Camden County Democratic Committee, for sanctions and attorneys' fees because they have failed to make the requisite showing that counsel for Plaintiff acted in bad faith in filing the Complaint and in conducting discovery. I shall, however, grant the motion of Norcross and the CCDC for summary judgment on Counts XIII, XV, XVI, XVII, XVIII, and XIX of the Complaint. Insofar as Norcross and the CCDC seek summary judgment on Counts IX, X, XII, and XIV, Plaintiff's claims for tortious interference with Plaintiff's contract and prospective economic advantage, and for civil conspiracy to so tortiously interfere and to defraud, I shall deny the motion for summary judgment without prejudice to the right of Norcross and the CCDC to renew this motion upon the conclusion of a Rule 104(a) hearing to determine the admissibility of alleged coconspirator statements, pursuant to Rule 801(d)(2)(E) of the Federal Rules of Evidence.

In addition, I shall deny the motion for summary judgment of the County of Camden as to Counts I, II, III, IV, VII, and XI of the Complaint. I shall grant the County of Camden's motion for summary judgment on Counts V, VI, XIII, XVII, and XIX of the Complaint. Finally, I shall deny the motion for summary judgment of Defendant, Thomas A. Mitchell, on Plaintiff's claim for common law fraud, Count VI, and civil conspiracy to defraud, Count XII. I shall, however, grant Mitchell's motion for summary judgment on Counts VIII, XV, XVIII, and Count XII of the Complaint to the extent it alleges a civil conspiracy to tortiously interfere.

Thus, Farris's remaining claims against the County are: (1) rescission or reformation of the renegotiated leases on the basis of economic duress, equitable fraud, and unconscionability, Counts I–II, which will be tried to the Court, sitting in equity; (2) breach of the original 1300 Building lease, Count IV; (3) breach of the renegotiated 1300 Building lease; Count VII; and (4) breach of the duty of good faith and fair dealing. Farris's remaining claims against Mitchell are Count VI, common law fraud, and Count XII, conspiracy to defraud. Pending the determination of the admissibility of the alleged coconspirators statements at a Rule 104(a) hearing, Farris's remaining claims against Norcross and the CCDC are: (1) tortious interference with Farris's contract and prospective business advantage, Counts IX and X; (2) civil conspiracy to tortiously interfere and defraud, Counts XII and XIV of the Complaint. The Court will enter an appropriate order.

### ORDER

This matter having come before the Court on the motions for summary judgment of Defendants, the County of Camden, Thomas A. Mitchell, George E. Norcross, III, and the Camden County Democratic Committee, and the motion for sanctions and attorneys' fees of Defendants, George E. Norcross, III, and the Camden County Democratic Committee, Walter F. Timpone, Esq., John T. Coyne, Esq., McElroy, Deutsch & Mulvaney, appearing on behalf of Defendant, the County of Camden, and William A. Garrigle, Esq., Garrigle, Palm & Thomasson, appearing on behalf of Defendant, Thomas A. Mitchell, and William M. Tambussi, Esq., Brown & Connery, LLP, appearing on behalf of Defendants, George E. Norcross, III, and the Camden County Democratic Committee, and Jerald R. Cureton, Esq., Darryl S. Caplan, Esq., and Anthony Valenti, Esq., Cureton, Caplan & Clark, P.C., appearing on behalf of Plaintiff, Rahn J. Farris; and,

The Court having considered the submissions of the parties, for the reasons set forth in the OPINION filed concurrently with this ORDER;

IT IS, on this 20th day of August, 1999, hereby ORDERED that:

(1) the motion of Defendants, George E. Norcross, III, and the Camden County Democratic Committee, for sanctions, attorneys fees' and costs is DENIED;

(2) the motion of Defendants, George E. Norcross, III, and the Camden County Democratic Committee, for summary judgment on Counts XIII, XV, XVI, XVII, XVIII, and XIX of the Complaint is GRANTED;

(3) the motion of Defendants, George E. Norcross, III, and the Camden County Democratic Committee, for summary judgment on Counts IX, X, XII, and XIV of the Complaint is DENIED without prejudice to their right to renew the motion at the conclusion of a hearing in this matter conducted pursuant to Rule 104(a) of the Federal Rules of Civil Procedure;

(4) the motion of Defendant, the County of Camden, for summary judgment on Counts I, II, III, IV, and XI of the Complaint is DENIED;

(5) the motion of Defendant, the County of Camden, for summary judgment on Counts V, VI, XIII, XVII, and XIX of the Complaint is GRANTED;

(6) the motion of Defendant, Thomas A. Mitchell, for summary judgment on Count VI of the Complaint and Count XII to the extent it alleges a claim for civil conspiracy to defraud, is DENIED;

(7) the motion of Defendant, Thomas A. Mitchell, for summary judgment on Counts VIII, XV, XVIII of the Complaint, and Count XII, to the extent it alleges a claim for civil conspiracy to tortiously interfere, is GRANTED;

(8) the application of Plaintiff, Rahn F. Farris, to adjourn the resolution of the motion for summary judgment of Defendants, George E. Norcross, III, and the Camden County Democratic Committee, filed pursuant to Rule 56(f), is DISMISSED as moot; and,

(9) the motion of Defendant, Judy Palombi, for summary judgment, filed April 30, 1999, is DISMISSED as untimely filed.